## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**JAMIE L. MELO**,                                   Chapter 7
    Debtor                          Case No. 14-12732-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**GEORGE ZACHARAKIS, INDIVIDUALLY AND
AS A MEMBER OF MEMOZA ENTERPRISES LLC
AND M&Z ENTERPRISES, LLC,**
    Plaintiff                       Adv. P. No. 15-1022
v.

**JAMIE L. MELO**,
    Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I.    INTRODUCTION

The matter before the Court is the Plaintiff's Complaint for an exception to
discharge of debts he alleges are owed by the debtor arising out of their business venture
in Honey Dew Donuts franchises.  The Complaint originally contained seven counts and
was filed against the Chapter 7 debtor, Jamie L. Melo (the "Debtor"), by George
Zacharakis ("Zacharakis"), in his individual capacity and as a member of two
Massachusetts limited liability companies, namely, Memoza Enterprises LLC
("Memoza") and M&Z Enterprises, LLC ("M&Z")(jointly, the "LLCs" or the
"Companies"), which were co-owned by Zacharakis, the Debtor and others.  Prior to trial,
the Court dismissed the following counts in the Complaint pursuant to Fed. R. Civ. P.
12(b)(6), made applicable hereto by Fed. R. Bankr. P. 7012(b): Count IV (Conversion),

1

Count V (Breach of Fiduciary Duty), Count VI (Deceit), and Count VII (Mass. Gen. Laws

ch. 93A) as such counts were claims based on state law, were duplicative of Counts I

through III of the Complaint, did not state a claim for any exception to discharge under

11 U.S.C. § 523 and were not properly before this Court.[1]  Through the remaining counts

of the Complaint, Counts I through III, Zacharakis seeks a determination that a debt

allegedly owed to him by the Debtor in connection with his *de facto* management of three

failed Honey Dew Donuts franchise locations, operated through the LLCs, is excepted

from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (4) and (6).[2]

The parties filed a Joint Pretrial Memorandum on June 19, 2015, in which they

admitted to numerous facts.  The Court conducted a trial over four days, at which five

witnesses testified and 26 agreed exhibits were introduced into evidence. On the first day

of trial, the parties submitted an Amended Stipulation of Facts in which they stipulated

to additional facts.[3]  They also submitted a document entitled "Further Stipulated Fact"

at trial, which provided the account numbers for seven Citizens Bank accounts owned by

the Debtor.  Following the trial, both parties submitted Proposed Findings of Fact on

---

[1] Zacharakis did not oppose the dismissal of these counts.

[2] As discussed in greater detail below, neither LLC is a named plaintiff in this adversary
proceeding, and Zacharakis did not expressly assert his exception to discharge claims
against the Debtor in the Complaint as derivative actions on behalf of the LLCs.

[3] The Amended Stipulation of Facts provides that certain parties are/were members of
the LLCs.  Despite any reference to the "current" status of members, as discussed
below, other agreed exhibits introduced at trial reflect that the parties to this adversary
proceeding are no longer members of the LLCs.

April 1, 2016.[4]   Thereafter, the Court identified several legal issues concerning the standing of Zacharakis to assert claims of the LLCs directly against the Debtor, which arose in the context of the parties' business dealings through the LLCs.  Despite the Debtor's failure to file a dispositive motion prior to trial, the Court ordered the parties to file supplemental memoranda on the legal issues outlined by the Court in an Order dated May 13, 2016.[5]  The parties filed their supplemental memoranda on June 20, 2016.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and (b) and the order of reference from the United States District Court for the District of Massachusetts.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  The Court now makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.  For the reasons set forth below, the Court rules that Zacharakis has not sustained his burden of proving an exception to discharge for any debt owed to him by the Debtor pursuant to 11 U.S.C. § 523(a)(2)(A), (4) or (6) and shall enter a judgment in

[4] On March 29, 2016, after the parties had substantially completed their Proposed Findings of Fact, the transcription service that prepared the trial transcripts issued amended transcripts for all four days of trial.  By agreement of the parties, the Proposed Findings of Fact filed by both parties contain references to the original transcripts. *See* both parties' "Proposed Findings of Fact" at n.1.  There is no indication that the amended transcripts differed in any material respect from the original transcripts upon which the parties relied for their submissions.

[5] The issues outlined by the Court, discussed in further detail below, primarily concerned whether Zacharakis, as an individual and a former member of the LLCs, could assert direct claims against the Debtor individually, or whether such claims were owned by the LLCs and should have been asserted as derivative claims on behalf of the LLCs.  The May 13, 2016 Order also required the parties to brief the issue of whether Zacharakis had established the existence of a debt owed to him by the Debtor for purposes of 11 U.S.C. § 523(a)(2)(A), (4) and (6).

favor of the Debtor with respect to all remaining counts in the Complaint, namely Counts I, II and III.

## II.   PROCEDURAL BACKGROUND

On June 5, 2014, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code, and he filed required Schedules of Assets and Liabilities and Statements on the same date.   On Schedule A – Real Property, the Debtor listed a home, which he held through a trust, located in North Dartmouth, Massachusetts, with a value of $260,000, subject to secured claims in the total amount of $220,129.   On Schedule B – Personal Property, the Debtor listed personal property valued at $19,338.00. On Schedule F – Creditors Holding Unsecured Nonpriority Claims, the Debtor listed George and Maria Zacharakis with "Unknown Trade Debt" in the amount of $1.00, and total unsecured nonpriority claims of over $258,000, many of which were characterized as "trade debt."[6]   On the Debtor's Statement of Financial Affairs (the "SOFA"), in response to Question 1 entitled "Income from employment or operation of business," he listed losses of ($5,649) and ($8,022) for 2012 with respect to Memoza and M&Z, respectively. In response to Question 10 of the SOFA, entitled "Other transfers," the Debtor listed Carlos Motto [sic] as the transferee of "Membership interest in M&Z … and Memoza … per resolution of corporate dispute."[7]

---

[6] The Court may take judicial notice of its own docket. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir.1999) ("The bankruptcy court appropriately took judicial notice of its own docket[.]").

[7] This transfer is described in greater detail below.

On September 9, 2014, Zacharakis filed a Motion to conduct an examination of the Debtor pursuant to Fed. R. Bankr. P. 2004 (the "2004 Exam") for the purpose of probing the Debtor's conduct and business activities in the operation and management of the franchise business. The Motion was allowed by the Court on the same day.  A deposition of the Debtor was conducted by Zacharakis on November 3, 2014 (the "Deposition").  On December 31, 2014, the Chapter 7 Trustee filed a Report of No Distribution.  On January 26, 2015, Zacharakis, after obtaining several extensions to do so, timely filed the Complaint which contains three remaining counts as follows: Count I (11 U.S.C. § 523(a)(4)); Count II (11 U.S.C. § 523(a)(2(A)); and Count III (11 U.S.C. § 523(a)(6)).  On January 27, 2015, the Debtor received a discharge of all of his dischargeable debts pursuant to 11 U.S.C. § 727.

## III.    FINDINGS OF FACT[8]

### A.  The Witnesses

This proceeding involves failed Honey Dew Donuts franchise businesses operated through Memoza and M&Z which were owned, to varying degrees, by six original partners, namely, Zacharakis, the Debtor, Lina Mota ("Lina") and her then husband, Carlos Mota ("Carlos"), Maria Zacharakis ("Maria"), who is Zacharakis's wife, and Samia Melo, who is the Debtor's wife.   Zacharakis testified that the venture began when he, as the manager of several gas stations, was approached by Samia, who worked with Lina at

---

[8] The Findings of Fact are derived from the testimonial and documentary evidence introduced at trial as well as the Amended Stipulation of Facts and the stipulated facts contained in the parties' Joint Pretrial Memorandum.

a Honey Dew franchise located in one of Zacharakis's gas stations, to ascertain whether Zacharakis would be interested in financing a new Honey Dew Donuts franchise.

All of the original partners, except for Maria, testified at the trial. Zacharakis received his college degree in 1988 and has worked in gas station management since that time. He devoted a minimum of 50 hours per week to his work. Lina testified that she had worked at various Honey Dew Donuts locations, including the one located in the station managed by Zacharakis, for about two years, and that she worked at that location with Samia who was her friend. According to Lina, the two discussed the possibility of owning their own Honey Dew Donuts franchise. Carlos, an owner of his own Honey Dew franchises, was an original partner in the venture, but eventually left the business following a dispute with the other partners which is discussed in greater detail below.

Zacharakis, Lina and Carlos testified and were credible in their accounts of the genesis of the business venture and their respective roles in the day-to-day operations. Despite their general credibility, each had difficulty recalling specific dates and frequently spoke in generalities, often referring to "the store" or "the bank account" when the business operated three retail locations and had multiple bank accounts. During their testimony, they also tended to conflate the ownership, assets, liabilities and operations of the LLCs.[9] This often resulted in confusing testimony about certain key events relevant to Zacharakis's burden of proof. The Court finds the versions of events recounted by Zacharakis, Lina, and Carlos to be credible.

---

[9] As a result of the frequently ambiguous testimony, references herein to "the business" are intended to refer to the operations of both LLCs, unless otherwise specified.

The Debtor is a Deputy Sheriff at the Bristol County Sheriff's Office in Massachusetts. He had some restaurant and cooking experience at his parents' restaurant. At numerous times during the trial, his testimony was unclear and evasive. He also was unresponsive to many questions. He frequently answered "I don't know," "I don't understand what you are asking me" or answered a question with a question when asked about routine matters. This resulted in a muddled and labored account of the parties' relationships and respective duties and obligations. Additionally, he admitted at trial to giving false testimony at his Deposition regarding the disposition of certain property owned by the LLCs. His bitterness over the failed business venture was evident in his testimony and demeanor. Samia, his spouse, also frequently failed to answer questions directly or clearly. Although her credibility about the extent of the Debtor's involvement in the business was dubious, she was generally credible in her description of the day-to-day business operations. As discussed in further detail below, the Debtor demonstrated very poor business judgment and lacked basic management skills. In addition, he maintained a separate, full time job at the Sheriff's Department which limited the amount of time he could spend at the business locations. Problems inevitably ensued in his management of a business which involved two limited liability companies, three retail locations, commercial leases and build-outs, inter-company debts, bank financing, multiple employees, franchise and meals tax reporting obligations and, critically, significant cash revenues. The Court must assess the Debtor's testimony in the context of his lack of financial sophistication.

B. <u>The Beginning</u>

Prior to formation of the LLCs, Zacharakis testified that he attended a meeting

with Maria, Lina, Carlos, the Debtor, and Samia, at which the group discussed a plan to

have Zacharakis finance a Honey Dew Donuts franchise which would be operated by

Lina and Samia.[10]  At this time, Lina testified, she did not know the Debtor very well, but

she had known Zacharakis for many years.  Similarly, Zacharakis testified that he did not

know the Debtor or Carlos when the venture started and that the initial planning meeting

was the first time he met them in person.  The Debtor testified that he became involved

in the enterprise "to see my wife have a better future," and that he did not intend for the

donut shops to be his day job because he worked full time at the Sheriff's Office.  Samia

testified that the Debtor supported her involvement in the venture and that he intended

to help by giving her money for the business.  She also testified that Zacharakis's sister, a

certified public accountant, assisted the group with their business plan and helped them

find an attorney.  The Debtor described his expectations of Zacharakis when the venture

began in 2011:

> I thought this is -- you know, this was going to be a good thing and that my
> wife was going to be involved in and because of his experience, I saw
> [Zacharakis] as a, you know, an owner of a Mobil. I said this guy knows
> what he's doing because I didn't know what I was doing, you know, to that
> point and I thought it was a good opportunity for my wife to better herself.

<div align="center">***</div>

---

[10] No one testified about the date of the meeting, but the Court presumes the meeting
took place in late 2010 or early 2011, based upon other facts in the record.

My expectation [sic] that [Zacharakis] would run the business and be part of the business . . . He'd guide me. He'd help me in whatever it was that I needed to do.

Samia testified that Zacharakis was going to be the "financial guy," that he had the most business experience and that "he was going to be basically the head of the partnership." She also testified that Maria was a bookkeeper for the business but when she left Danielle Burke was engaged as her replacement because she was a friend of Zacharakis's sister. Neither party called Ms. Burke or any other bookkeeper or accountant for Memoza and/or M&Z to testify at trial.

C. Memoza Enterprises LLC

Following their initial meeting, Zacharakis, Maria, the Debtor, Samia, Carlos and Lina met with representatives of the Honey Dew franchisor. On March 7, 2011, Memoza was formed as a Massachusetts limited liability company. The following day, on March 8, 2011, an Operating Agreement was entered into by and among Samia, Lina and Zacharakis, as managers of Memoza, and the Debtor, Carlos and Zacharakis as members of Memoza (the "Memoza Operating Agreement"). According to Schedule A of the Memoza Operating Agreement, the capital contributions and membership interests of Memoza were as follows:

| Name | Capital Contribution | % Capital Contribution/ Percentage Interest |
|------|------|------|
| George Zacharakis | $10,000 | 40% |
| Carlos Mota, Jr. | $ 7,500 | 30% |
| Jamie Melo | $ 7,500 | 30% |
| **Total** | **$25,000** | **100%** |

As stated above, Zacharakis was both a member and a manager of Memoza, Samia and Lina were nonmember managers and Carlos and the Debtor were members of Memoza, but not managers. Section 6.01 of the Memoza Operating Agreement, entitled "Management of the LLC" provided that, except for certain transactions which required unanimous member approval, "the overall management and control of the business and affairs of the LLC shall be vested in the Managers . . . , [and] all . . . actions . . . taken . . . by the Manager shall require the approval of a majority in number of the persons serving as Managers unless otherwise specifically provided herein." The Debtor, in contrast to Zacharakis, had no duties or powers as a manager of Memoza under the terms of the Operating Agreement. The Memoza Operating Agreement also provided the following:

**Section 3.05** *Voluntary Loans*

In the event the LLC requires additional funds to carry out its purposes, conduct its business, meet its obligations or make any expenditure authorized by this Agreement, and additional funds are not available from third parties . . , any Member may, but shall not be obligated to, loan such funds to the LLC. *Any loan made pursuant to this Section 3.05 (a "Voluntary Loan") shall be nonrecourse to the Members . . . ;*

(emphasis added).

**Section 6.07** *Exculpation and Indemnification; Fiduciary Duty*

(a)  The Members' respective Obligations to each other are limited to the express obligations described in this Agreement, which obligations the Members shall carry out with ordinary prudence and in a manner characteristic of businesspersons in similar circumstances.  *No Member shall be a fiduciary of, or have any fiduciary obligations to, the other Members in connection with the LLC, this Agreement, or such Member's performance of its obligations under this Agreement; and each Member hereby waives to the fullest extent permitted by applicable law any rights it may have to claim any breach of fiduciary obligation under this Agreement or in connection with the LLC. . . .*

(emphasis added).

Zacharakis testified that it was his expectation that Samia and Lina would run the day-to-day operations of Memoza.  He maintained that his role was limited because he had another full-time job: "I knew that I was just financing.  I didn't have time to run a donut shop.  Samia and Lina were supposed to run the donut shop."

Memoza opened its Honey Dew franchise in Raynham, Massachusetts (the "Memoza Location") in June of 2011, under a lease with Linear Properties ("Linear"). Zacharakis testified that he, the Debtor, and Carlos agreed to and became personally obligated under the lease. Zacharakis testified that the Memoza Location opened after Memoza secured a $150,000 loan from Rockland Trust Company ("Rockland Trust") and the three members of Memoza agreed to and guaranteed the obligation to Rockland Trust.  To secure the loan, Zacharakis testified that he pledged $50,000 in cash and that Carlos pledged his house. According to Zacharakis, the Memoza Location served as both

11

a Honey Dew retail location and a baking facility which supplied goods and products to

other Honey Dew locations.[11]

D. <u>M&Z Enterprises, LLC</u>

Zacharakis testified that the Honey Dew franchisor insisted that a second Honey

Dew franchise location be opened soon after the opening of the Memoza Location. On

August 12, 2011, M&Z was formed as a Massachusetts limited liability company for, as

Zacharakis testified, the purpose of operating a second franchise location.  In February of

2012, an Operating Agreement was entered into by and among the Debtor, Zacharakis,

Samia and Maria, as members of M&Z (the "M&Z Operating Agreement").  M&Z had no

managers, and its affairs were managed by its members based on the Membership

Percentage Interest as set forth on Schedule A to the Operating Agreement which

provided:

| Member | Capital Contribution | Percentage Interest |
|--------|----------------------|---------------------|
| Jamie Melo | $1,350 | 45% |
| George Zacharakis | $1,350 | 45% |
| Samia Melo | $  150 | 5% |
| Maria Zacharakis | $  150 | 5% |
| **Total** | **$3,000** | **100%** |

On March 16, 2012, Honey Dew Associates, Inc., as franchisor (hereinafter the

"Franchisor") entered into a Franchise Agreement with M&Z, as franchisee (the "M&Z

Franchise Agreement").  Zacharakis testified that M&Z opened a Honey Dew location at

---

[11] The parties did not enter into evidence a franchise agreement between the Honey
Dew franchisor and Memoza. Nevertheless, Exhibit 10 introduced at trial contains a
reference to a Franchise Agreement between Honey Dew Associates, Inc. and Memoza
dated March 15, 2011.

a Mobil gas station managed by Zacharakis located at 1095 County Street in Taunton, Massachusetts (the "M&Z Mobil Location") in the fall of 2011,[12] which was managed by Vanessa Alexander ("Vanessa").  In or around April of 2012, M&Z opened another Honey Dew store inside a convenience store at a Prestige gas station located at 13 Cape Road in Taunton, Massachusetts (the "M&Z Prestige Location").

    E.   The Dispute with Carlos

According to Zacharakis, neither Carlos nor Lina were offered ownership interests in M&Z because a dispute among the parties arose in the spring of 2011 involving the construction and permitting of the Memoza Location which had been directed by Carlos. As a result of this dispute, Zacharakis testified that he and the Debtor "had to pay off Carlos" as Carlos had sold his house in May of 2012, apparently to satisfy his guaranty of Memoza's obligation to Rockland Trust.  Zacharakis testified that, by agreement, he and the Debtor became obligated under a promissory note in favor of Carlos in the principal amount of $135,000 (the "Carlos Note").

    F.   Management and Operations of Memoza and M&Z from 2011 to 2013

Memoza and M&Z experienced financial problems early in their operations. During 2011 and 2012, the Debtor made loans to the business and asked Zacharakis for loans to help sustain business operations.[13]  Zacharakis initially provided loans, without inquiry, until he became aware of the Companies' cash problems during 2012.  At that

---

[12] It is unclear why the M&Z Franchise Agreement was executed several months after M&Z opened the M&Z Mobil Location.

[13] Neither party submitted evidence that the loans were documented.

time, he stopped providing loans and eventually resigned from both Memoza and M&Z.

He testified that in 2012, he was receiving notices from creditors about unpaid bills and

then discovered that Memoza and M&Z had numerous checks returned for insufficient

funds, resulting in substantial bank fees.

In order to explain the circumstances surrounding the advancement of loans by

Zacharakis, his eventual departure from the business, and his claims against the Debtor,

the operations and banking practices of Memoza and M&Z from inception through 2013,

as described by Zacharakis, the Debtor, Lina, and Samia are pertinent.[14]

1.   Operations-Zacharakis's Account

Zacharakis described the roles of each principal in the day-to-day operations of

Memoza and M&Z:

> I really didn't have any responsibilities.  I was just financing the opening of
> the stores.  And once in a while I would ask if they needed supplies to be
> delivered in the morning before going to work. . . . At first I would stop by
> every morning and ask if they needed help[,]  . . . [but this] tailed off at the
> end of 2012, the beginning of 2013.

Although Zacharakis's operational role was limited, he testified that he hired a number

of friends and family members as accountants, bookkeepers and attorneys for the

Companies. With respect to the Debtor's involvement, Zacharakis testified that the

---

[14] Carlos testified that he never had any involvement with operations prior to the
termination of his relationship with Memoza.

Debtor took a more active role after Carlos left the venture:

> [The Debtor] was really involved by getting store sales information to me and what the promotions are going to be and how things were running.

> ***

> [W]hen Carlos was bought out, [the Debtor] said he was going to start running the stores more so we wouldn't have any more issues . . . . [H]e was writing checks and paying the vendors and was there pretty often, running the store. . . . [H]e would drop by my gas station almost daily and tell me how things were running and he would give me store numbers, sales numbers.

Zacharakis testified that the Debtor would call and text him on a daily basis with sales information during the period of 2011 through early 2013. Zacharakis had limited knowledge of operational issues, such as whether M&Z ever paid Memoza for any of the baked goods or products it received from Memoza. According to Zacharakis, although the store locations were managed by Lina, Vanessa and Samia, the Debtor was overseeing the operations of all three locations, paying the bills for each and controlling the checkbooks for checking accounts maintained by Memoza and M&Z at Citizens Bank.[15] Zacharakis testified that the Debtor had physical control of the checkbooks but that he may have had check signing authority as well. He said that the Debtor had control of the checkbooks because he had told Zacharakis and the other partners that he was "really meticulous about writing checks . . . and paying bills . . . . " Zacharakis maintained that, until 2012, he was just the financier of the business, and that he had no other operational involvement other than receiving information about store sales.

---

[15] At some point, the Companies moved their banking business from Rockland Trust to Citizens Bank.

2.  Operations-Lina's Account

Lina testified that she was a store manager at the Memoza Location from 2011 to the beginning of 2014, and that she and Samia generally managed that location at different times of the day because of the long hours required.  According to Lina, it was initially agreed among the parties that she and Samia would run the day-to-day operations of the stores. She shared responsibilities with Samia for placing orders, scheduling shifts, managing employees, and compiling "cash and balance" weekly reports to submit to the Franchisor.  She described the process of compiling those reports: "[E]very day we count the cash, enter in what our credit cards are, gift cards, and then that's whatever the amount is that gets deposited[,]" and the reports would then be emailed to the Franchisor on a weekly basis.

According to Lina, the Debtor was generally not present at the stores during the work week.  She testified that he did not work at the counters or cash registers, supervise employees or handle either hiring or firing employees. She said the Debtor was not in charge of the day-to-day operations at the stores and did not handle the cash deposits as those were handled by her and Samia on a daily basis. She also maintained that the business suffered from cash problems starting in 2013.

According to Lina, the Debtor was "mainly" responsible for paying the Memoza bills, that she did not pay them, and that she never observed Samia paying them. She testified that the Debtor would sign checks payable to "Perkins," a large food and dry goods supplier, which she would give to Perkins when it delivered food and supplies to

16

the stores.  With respect to regular monthly bills, such as utilities and rent, Lina testified that those bills also were paid by the Debtor.

Lina testified that Zacharakis would stop by the store in the mornings to see if anything was needed. Otherwise, she observed, he did not pay any bills.  She testified that she never checked bank balances as she had no access to, or signatory authority with respect to the LLCs' bank accounts at Citizens Bank, although the Debtor and Samia testified otherwise.  She maintained that the Debtor was "the one mainly in charge of the banking."

3.  Operations-the Debtor's Account

The Debtor recounted his own management role in the venture as more limited than the role Zacharakis and Lina described.  His testimony was often evasive and sometimes cryptic with respect to day-to-day management issues.  He repeatedly claimed ignorance about critical operational issues such as the amount of bank balances at various times, whether M&Z paid Memoza for supplies and products, and whether M&Z or Memoza paid employees who worked at both locations. He reiterated at several points during the trial that the business had cash problems since "day one" and that the business was in constant need of cash: "Things just kept falling behind and in order to go forward we'd have to put money in."  Samia agreed; Lina, however, maintained that the cash problems started in 2013. The Debtor testified that he personally loaned funds to pay mortgage, rent, and utility expenses for the business, and such loans have never been repaid to him.  The parties stipulated that the Debtor made loans totaling $124,734 to Memoza and M&Z between 2011 and 2014.

17

The Debtor repeatedly suggested that Samia and Lina truly operated the business, with input from Zacharakis, and that he was merely there to "help out" and do "whatever I was asked to help with" because he had a full-time job at the Sheriff's Department, often working more than 40 hours per week. He maintained that he did not visit the stores on a day-to-day basis and would typically visited on weekends or during the week if he had a day off.  He testified that Samia managed the three store locations at different times, and that "she did everything," although he was generally vague in his description: "She did daily duties, whatever the daily duties were." He said he did not supervise Samia with respect to deposits or in any regard and that "it was her business," not his. Nonetheless, the parties stipulated that the Debtor instructed and directed the work of employees when he was on site at a franchise location.  He also signed numerous checks on the business accounts as discussed in greater detail below.  With respect to paying bills, the Debtor testified that he did not always check bank account balances prior to writing checks.  He further testified that Samia and Lina were both authorized signatories on the business checking accounts and that he often relied on them for determining what bills to pay:

> A lot of times I would ask if there was money, but if we're paying something and my wife would say, we have to pay this or we have to pay that, I would check to see.  And if there was money there we'd send it out at the time.
>
> ***
>
> Either Samia or Lina [would] give me a receipt or an envelope saying we got to pay this or we got to pay [that] [sic].

18

The Debtor also maintained that he received input from Zacharakis when determining what bills to pay. The Debtor testified that Samia and Lina had control of the business checkbooks, adding that he sometimes had custody of them.

With respect to monitoring sales information of Memoza and M&Z, the Debtor testified that he would call and text employees at the franchise locations at the end of their shifts to obtain sales volume information and would then pass the information along to Zacharakis. He stated that he otherwise did nothing with the information, and he did not check to see whether deposits were being made on a daily basis in accordance with sales revenues. When asked whether he ever compared sales information with bank deposits, the Debtor testified that he did not because he focused more on determining if the stores "did better [on sales] than the day before. That's all it was." He also testified that he did not know whether Memoza received money for delivering products to M&Z.

### 4. Operations-Samia's Account

Samia testified that it was she, and not the Debtor, who ran the day-to-day operations of the business, with Lina's help, and that she was the person most knowledgeable about the bills, financial condition and cash position of the business. She said the Debtor would come to the stores on the weekends when she worked and only came during the week when he had a day off from work. She conceded that she sometimes paid vendors, such as Perkins, by check even when she knew there were insufficient funds in the bank accounts to cover the checks, hoping that there would be sufficient funds to honor the check when it was later cashed. She said that the Debtor paid a number of the business bills by check, including Perkins and the utilities, that she

did not direct him to do so, because "he was . . . trying to help us."  When examined by

the Court regarding why the Debtor signed checks when she had the checkbook and the

ability to sign checks, she replied "[H]e will [sic] do that just to help out . . . doing

something to help."  She testified that she and the Debtor both balanced the checkbooks,

although they did it separately and that the Debtor did it "towards the end."  According

to her, Zacharakis was generally "not around" to sign checks but she would give him

"updates of everything that was going on" every morning when he would stop by the

stores until 2013, when their communication stopped.  She maintained that the business

was "not doing well" from the beginning, that it required personal loans from the

partners.

     G.  <u>Memoza and M&Z Banking Practices</u>

    Memoza and M&Z each maintained separate payroll and operating accounts at

Citizens Bank.  The parties introduced into evidence bank statements with respect to the

Memoza Payroll Account (#4374), the Memoza Operating Account (#4382), the M&Z

Payroll Account (#9327), and the M&Z Operating Account (#9319), as well as copies of

numerous checks issued from these accounts. The Debtor testified that he was a signatory

on all of the Citizens Bank accounts and that he had on-line access to those accounts as

well. The Debtor also maintained seven (7) personal bank accounts at Citizens Bank.   In

general, the Debtor's testimony about the Companies' banking practices, including the

facts surrounding electronic funds transfers and the issuance of checks, was vague and

evasive.  He frequently responded "possibly" when asked if he made certain electronic

transfers and "I don't know" regarding the details of certain transfers.   He also

consistently maintained that anyone else with electronic access to the accounts could have also made the transfers. With respect to the issuance of certain checks signed by him which were introduced into evidence, the Debtor frequently testified that he signed checks at the direction of Samia and Lina.

  1. Electronic Account Transfers Between Business and Personal Accounts

   The Debtor initially testified that he did not recall transferring funds between his personal accounts and the Companies' accounts, but then acknowledged doing so when presented with evidence of several electronic transfers of funds between one of his personal accounts and the LLCs' bank accounts during the summer of 2013. When asked why he would have transferred money between business accounts and his personal account, he testified that he would sometimes repay himself for amounts he personally advanced for the business and that any such reimbursement would have been supported by a receipt given to the Companies' bookkeeper, Danielle Burke. He could not explain why each transfer was in "round" amounts between $75 and $300. When asked whether he could recall the total amount he personally transferred between his account and the M&Z and Memoza accounts, he said he could not.

  2. Inter-Company Electronic Account Transfers

   With respect to the Memoza Operating Account bank statement for August of 2012, there were seven electronic transfers made on August 29, 2012, four of which went from the Memoza Operating Account into the Memoza Payroll Account. When asked who made those transfers, totaling $950, the Debtor initially said he did not know, but then conceded that it could have been him. He could not explain the reasons for the

transfers or the circumstances surrounding the transactions.  He said Lina or Samia could have made the transfers, but he could not recall whether anyone other than himself made transfers.  He testified that anyone with access to the account passwords could have made the transfers and that the Debtor, Zacharakis, Lina and Samia all had passwords for the business accounts.  He explained that he knew this because he got calls from each of them at different times to tell him there was no money in one or more of the accounts.  He denied that they called him because he was "running the finances of the company" and that it was more likely they called him because he was putting so much money into the business. Notwithstanding the Debtor's contention about her access to the Citizens Bank accounts, Lina testified that she had no access to, or signatory authorization for, those accounts.

Similarly, when shown bank statements reflecting numerous inter-company electronic transfers among the Memoza Payroll and the Memoza and M&Z Operating accounts in April and July of 2013, the Debtor testified that he could have made the transfers but could not explain the details surrounding them. Many of these transfers involved small amounts of money and occurred on the same date.  The Debtor could not recall or explain why multiple electronic transfers were made to and from business bank accounts on the same day.  When Samia was asked whether she made any electronic transfers between the business and personal accounts, she initially testified that she did not remember, but later said she may have effected such transfers to reimburse herself or the Debtor for business expenses paid personally by them.  She said that she had receipts for expenditures which were given to the bookkeeper and that she and Lina maintained

a book to record cash expenditures at the office although she did not know the present location of the book.  She added: "[I]f I knew . . . that I was going to be here one of these days . . . I would have kept everything."

       3.   Memoza and M&Z Checks Issued in 2012

The Debtor testified several times during the trial that he only signed checks for certain creditors, usually at the direction of Samia or Lina, and that he did not sign payroll checks. The parties introduced Memoza Operating Account checks signed by the Debtor in the spring of 2012, which were made payable to suppliers Perkins and Garelick.  When asked why he wrote those checks, he said he was directed to by Samia and Lina and that otherwise "I wouldn't know who to write the check to." Other Memoza Operating account checks made payable to bakers employed by Memoza or M&Z signed by the Debtor were also introduced.  When asked "What accounting does Memoza and M&Z have for who was paid cash versus checks?" he replied "That I don't know . . . I didn't have anything to do with that." He maintained he signed checks at the direction of Samia and Lina, that he made no independent inquiries about amounts allegedly owed, he did not request a bill to support the requested payment, and he conceded that he was a "sheep" when asked to sign checks. He also maintained that he did not check the bank account balances for sufficient funds before signing checks and that he only checked balances out of possible curiosity.

Several M&Z Operating Account checks were also introduced into evidence, made payable to some vendors, the Debtor's personal attorney, and the owner of the M&Z

Prestige Location.  As with the Memoza bank accounts, the Debtor testified that he did

not check the account balance prior to signing these checks.

### 4.  Jamie Melo Memorial Fund Checks Issued in 2013

The Debtor testified that "The Jamie Melo Memorial Fund" (the "Fund") was

established for his son in 2006 after his mother died.  The Debtor testified that the Fund

maintained its own bank account, on which the Debtor was the sole signatory, and which

was separate from and had nothing to do with Memoza or M&Z.  A series of checks

issued in the name of the "Jamie Melo Memorial Fund" but bearing the account number

for the Memoza Payroll Account were introduced into evidence.  The checks were issued

in August and October of 2013, totaled approximately $370, and were made payable to

vendors of the LLCs.  When asked why the checks had the Memoza Payroll Account

numbers, the Debtor initially said he was confused and replied "That I would not be able

to explain. I have no idea, sir[.]"  The Debtor later explained that the Fund checks were

issued by Citizens Bank with the Memoza Payroll Account number due to his on-line

banking "profile," that his social security number may have been linked between his

personal accounts and the LLCs' accounts at Citizens Bank. When asked whether he did

anything to address this matter after receiving his monthly bank statements for the Fund,

he replied "No, I didn't.  Shame on me."  The parties stipulated on the record that the

amounts reflected on the Fund checks were actually paid from the Memoza Payroll

Account.

5.    Cessation of Cash Deposits into the Memoza Operating Account

In the summer of 2013, cash deposits into the Memoza Operating Account ceased and never resumed, even though Memoza was conducting business during that time.[16] The Debtor's testimony on this matter was extremely muddled and indecipherable.  At first, he maintained that he never noticed that revenues were not being deposited into the Memoza bank account: "[T]hat wasn't an issue with me… I didn't have anything to with that." The Debtor later explained that there were two reasons why cash deposits were not being made into that account during that time, namely that Carlos and the Massachusetts Department of Revenue ("MDOR") had both obtained liens and had "frozen" the Memoza Operating Account.  The Debtor had difficulty recalling the dates involved but believed the MDOR lien became effective in August or September of 2013 and was related to unpaid meals taxes. The Debtor said he called the MDOR about the liens and made payment arrangements but was unsure how long it took to resolve the matter, how much money had to be paid to the MDOR, or the source of the funds. He also testified that he enlisted the help of an attorney to resolve the tax matter. At first, he testified that he was not sure if he told the other partners about the MDOR matter, and then said he told Zacharakis, but he could not recall the details of the discussion, how frequently he updated him or whether he reported the resolution of the matter to him. The Debtor testified that, to his knowledge, he was the only person who worked on the MDOR

---

[16] Credit card deposits continued to be made.

matter.  As discussed further below, the Debtor handled this matter after Zacharakis resigned from the Companies and while he and the Debtor were no longer communicating directly.  It is unclear from the record, including the bank statements which were introduced into evidence, whether the MDOR or Carlos actually levied on any of the Companies' bank accounts.

When asked what happened to the cash deposits that should have been made during the months of the MDOR "freeze" on the Memoza account, the Debtor testified that the cash generated by Memoza was deposited into the M&Z bank accounts. Although he said he understood that Memoza and M&Z were separate entities with separate expenses, employees and tax obligations, the Debtor said the M&Z bank accounts were used to deposit cash generated by both entities.  He said that Memoza and M&Z bills were both paid from the M&Z accounts, and he denied that funds were deposited into the M&Z account to evade creditors, specifically Carlos.

H.  <u>Cash Management and Deposits of Cash</u>

Samia testified that either she or Lina made cash deposits on a daily basis, including on Sundays, and that Memoza cash was deposited into M&Z accounts after the MDOR "froze" the Memoza account.  She said that she would open the Memoza Location at 5:00 AM and that Lina would then come to the Memoza Location after collecting all cash from the M&Z Locations in the mornings.  Samia said that the cash was "pulled" early in the morning.  The money would then be counted and a deposit slip would be prepared by one of them.  According to Samia, either she or Lina would later deliver the cash deposit to the bank with the completed deposit slip. She maintained that from the

time the deposit slip was prepared until the time of deposit, no one could have taken

cash.  She said that she and Lina were the only ones with access to cash on a daily basis,

and that neither she nor Lina stole any money.  She testified that the Debtor "never" had

access to cash but then said he would occasionally handle a deposit on a Saturday, but

only after she had counted the cash and prepared the deposit slip.

Lina testified about the "cashing out" process which occurred at the end of every

shift:

> [E]ach shift counts down their drawer. There's a certain amount of money
> in the drawer that remains in the drawer for, you know, change purposes
> and then whatever is like left over is what gets dropped in -- is put into the
> deposit.

When asked about how cash was handled, she explained:

> [I]t gets -- we mainly handled it in Raynham because that's where we had
> our office, so that's where the money would go. We would count it and then
> write out the deposit slip.

> [E]ach shift they pull up a receipt. It lets us know what their shift did for
> the day and then they write down how much is excess, which is their cash,
> and then they put it into an envelope and they would just put it into the
> office.

Lina testified that a cash envelope was then "dropped" into a compartment in the

locked office at the Memoza Location and that she, Samia and the Debtor all had access

to the office.  She also testified that she saw the Debtor, mainly on weekends and "maybe

a few times during the week" collecting the mail and bills. She said the Debtor did not

handle the cash deposits as she and Samia handled them on a daily basis.

I. <u>Cash Payments</u>

According to the Amended Stipulation of Facts, the Debtor admitted that he "would remove money from the cash registers on certain occasions when he was at a franchise location[,]" but he maintained at trial that he did so to repay himself after he had personally paid a business expense and that he or Samia would send receipts for these expenditures to the bookkeeper. The Debtor testified that he would purchase print shop items and goods from local supermarkets for which he would submit a receipt and be repaid from the cash register by Lina or Samia. He maintained that he otherwise "never" took any cash from Memoza or M&Z. The Debtor reported that some expenses and employees, including bakers, were also paid in cash. He was able to identify some, but not all of, the bakers by name but could not say how much or how frequently they were paid in cash as there were no records or accountings of the cash payments as far as he knew. When asked whether those employees were paid partly or completely in cash, the Debtor said that some received checks in addition to cash but that Lina and Samia actually made the determination about the method of payment. "I did sign some checks, but I didn't make that determination."

Lina testified there were "cash problems" with the business beginning in 2013. She testified that she and Samia were supposed to receive $500 per week in salary for their work at the stores but that frequently, after 2012, there was not enough cash to support those payments, and they would take a lesser amount. Sometimes, she testified, she was paid in cash "when supposedly there was no money and we kind of would hold off on getting paid so that it wouldn't go through payroll . . . so we would hold off and get paid

in cash instead." She was vague about the number of times this occurred, testifying that it could have happened between five and ten times involving "probably" less than $2,000, but she seemed unsure about her answer. She also maintained there were a few times when others were paid in cash "but for the most part everybody got paid by check unless there was an issue with the payroll." She estimated that fewer than four employees were paid in cash. She said the Debtor sometimes advised her to tell employees not to cash their Friday paychecks because there was no money in the bank. She testified that no records were maintained about which employees were paid in cash, how much or when they were paid, but that Samia usually made the cash payments to employees. When asked whether employees could have received more than $10,000 in cash, she equivocally replied that she did not think so, but said "I could be wrong." Lina maintained that vendors were not paid in cash: "You can't pay cash to vendors . . ." and that they were paid "by check on delivery."

The parties introduced an email sent by the mother of three Memoza and M&Z employees to the customer support department of the Franchisor in February of 2013, in which she complained that "The Manager, Jamie [Melo], has held checks several times without explanation, their checks have been returned by the bank for insufficient funds on more than one occasion . . ." When asked whether he instructed anyone to withhold payroll checks, the Debtor replied "If we don't have money I would tell Lina or Samia that 'Listen, there's no money. You know, can't send out the checks.'"

J.   Income and Meals Tax Reporting

The Debtor testified that he handled the electronic submission of meals tax returns

to the MDOR for both LLCs during the entire period they were in business at the request

of Zacharakis, Lina, Carlos and Samia at a meeting held among them on an unknown

date.  He said that this practice began in 2011 and that he performed this function until

the business closed in 2014, using sales figures supplied to him by Samia and Lina. He

said that Memoza and M&Z did not always have sufficient funds in their bank accounts

to pay the meals taxes when they became due. In such cases, the Debtor testified, he

would discuss whether to pay the taxes, or some other outstanding bill, with Zacharakis

before he resigned from the Companies and later with Samia and Lina. "It would be, do

we pay the rent? Do we pay the meals tax? What do we pay?" The parties stipulated that

the Debtor signed all tax returns for both LLCs for the years 2013 and 2014. The Debtor

testified that he did not always check bank account balances prior to issuing a check to

the taxing authorities.

K.   Loans Made by Zacharakis and the Debtor

Zacharakis testified that the Debtor called him in November 2011 to report that the

business had slowed down and to request a loan from Zacharakis to pay rent for the

Memoza Location.  He said he wrote a check directly to Linear, Memoza's landlord, at

the request of the Debtor, who represented to Zacharakis that he was also loaning money

to the business. Zacharakis testified that he made ten to fifteen loans in the approximate

total amount of $83,000.  Some of the loan proceeds were used to pay Linear or were sent

directly to Memoza and/or M&Z at the request of the Debtor through June 2012.[17]

Zacharakis testified that he initially did not ask the Debtor for financial documentation

to support the loan requests because he trusted the Debtor at that time.   He stated that

he was receiving daily sales figures from the Debtor when he was making the Loans and

assumed that all sales revenues were being deposited into the Memoza and M&Z bank

accounts. He added that "If . . . deposits [were] being made, I don't think I would have

had to loan the money to the business."

The Debtor maintained that he would ask Zacharakis for loans after being told by

Samia or Lina that cash was needed to pay a particular creditor.  The Debtor testified that

he also made loans to Memoza and M&Z, and the parties stipulated that the loans totaled

$124,734.12. He also said that Samia, Lina and Zacharakis frequently asked him "to put

money into the business" whenever supplies were needed or creditors needed to be paid.

Despite the problems with the business, the Debtor testified that he could not seek

assistance from Carlos, who had left the business, or Lina, who had no money, and that

Zacharakis was the only other available source for loans among the partners. The Debtor

testified that he spoke to, or met with, Zacharakis every morning during this time period

to provide sales information and discuss the business, although they did not discuss bank

deposits.

---

[17] At a later point in his testimony, Zacharakis testified that he made his last loan in October of 2012. According the Amended Stipulated Facts, Zacharakis made his last loan in November, 2012.

In the summer of 2012, Zacharakis testified that he "couldn't afford any more loans" and otherwise believed the business should have been self-sustaining.   In the fall of 2012, Zacharakis procured financial information for the business from the bookkeeper which he reviewed with his spouse, Maria, and a business consultant who had franchise experience. As a result of this review, he testified, he learned that there had been several bounced checks and resulting bank fees and that the payroll costs were "really high."

According to Zacharakis, he called a meeting among the partners in November 2012 "to help us see why [the business] needed all the money," to make suggestions to improve business operations and to ask for control of the business checkbooks. This was the first time, Zacharakis said, that he became involved in the financial operations of the business. Zacharakis testified that he, Maria, Samia, and Lina attended the meeting, but the Debtor did not attend.    At the meeting, he testified, he requested control of the checkbooks and made suggestions about improving business operations.  He further testified that his requests and ideas were rejected by the Debtor who called him later in the day to tell him "to get out of the business" if he did not like the way it was being operated.  Zacharakis was concerned: "[W]e looked at the numbers from the bank and the money should have been there and it was not there."  Samia said that she did not give Zacharakis control of the checkbooks because all members, including the Debtor who was not at the meeting, had to discuss the matter.  According to Samia, no full member meeting was ever called or held.

L.   Zacharakis Resigns from Memoza and M&Z

Zacharakis testified that he decided to seek a buyout of his interests in the business after the November 2012 meeting, and that he and Maria approached the Debtor for a buyout in January of 2013 after meeting with an attorney, but no agreement was reached. At some point in late 2012 or early 2013, Zacharakis and the Debtor stopped speaking directly, although their respective attorneys exchanged correspondence. On February 2, 2013, Attorney Paul Prew, who represented Zacharakis and Maria, sent a letter to the Debtor as the "*de facto* Operator" of Memoza and M&Z, requesting a buyout and indemnification of liabilities for Zacharakis and Maria.  Zacharakis and the Debtor both testified that the Debtor did not respond to the overture, and the Debtor maintained that he did not want to buy their interests and had no money to do so.

On March 6, 2013, Zacharakis executed letters of resignation with respect to Memoza and M&Z (the "Resignations").  Each letter provided "Although I do not have record of official appointment of such, but to the extent recognized by law, I hereby resign as Director and Officer of [the LLCs] . . . effective immediately."  At that point, Zacharakis testified, he concluded that the business needed to be sold.

In the fall of 2013, a potential buyer, Sunil Patel, was identified to purchase the franchise locations but no sale was consummated because, according to Zacharakis, "the numbers were not adding up to the amount that we were trying to sell to him for." Attempts to sell to other potential buyers also were unsuccessful, according to Zacharakis, because they asked for financial information and "we couldn't get to them – the information to them fast and they dropped off."  Zacharakis maintained that he

allowed the business to continue after it showed signs of distress rather than close operations because he did not want to lose his investment.

M. <u>Management of Memoza and M&Z in 2013 and 2014</u>

After Zacharakis resigned, the Debtor testified, he would determine whether to pay the MDOR after consultation with Lina and Samia. "I'd ask them if I can pay it and they would say yes or they would say no, hold off." He testified that he worked with a CPA but did not review the tax returns or talk to the professional who prepared them prior to signing them. With respect to banking operations for Memoza and M&Z, the Debtor testified that Samia and Lina, until she left the venture in early 2014, handled the majority of the banking duties, including deposits and payroll and that he and Vanessa also performed some duties as well. When asked whether anybody else handled banking duties in 2013 and 2014, the Debtor replied: "Maybe the people that worked there. I wasn't there all the time, so I don't know.  I couldn't answer that truthfully."  He maintained that he did not know "how deposits were made [or] how they were compiled and calculated[.]" He also maintained that, to the best of his memory, every decision regarding which bill to pay from January 1, 2013 through the closure of the stores, which occurred in 2014, was made in consultation with Lina and Samia. On October 22, 2013, the Debtor's attorney, Attorney Michael Medeiros, sent a letter to Zacharakis's counsel concerning a potential sale of the LLCs in which he stated that the Debtor "is willing to allow [Zacharakis] until . . November 20, 2013 to conduct . . . due diligence . . . Thereafter [the Debtor] states that he does not believe he can continue with the day to day operations."  When asked whether he considered himself the day-to-day operator at that

time, the Debtor replied "I wasn't a day-to-day operat[or].  I did –I did help," and insisted

that Lina and Samia were the day-to-day operators.

### N. M&Z Prestige Location Equipment

The M&Z Prestige Location opened in the spring of 2012 and operated as a kiosk

at a gas station and car wash owned by a third party. The Debtor testified that the store

performed poorly from the start, and that in the spring of 2013 a decision was made to

close the store. Zacharakis testified that the Debtor handled the logistics of closing that

location because he had a good relationship with the landlord and that "[the Debtor] told

me that he had to leave [the equipment at the Prestige Location] to cover the lease."  The

Debtor testified at trial that he stored the M&Z Prestige Location equipment in his garage

after closing the store, and he continues to possess it. At the Deposition, the Debtor

testified to the contrary and maintained that he did not have possession of the Prestige

Location equipment and that it "'had to stay'" at the site following the closure because

"'That's what the lease said[.]"  When asked at trial why he made conflicting statements,

the Debtor replied that he was very angry and frustrated during the Deposition and

conceded that he had lied. Zacharakis valued the equipment at $7,500, which the Debtor

did not refute.

### O. Incident at the Memoza Location

The Debtor and Samia both testified that they closed the Memoza store during the

afternoon of March 16, 2014 because Samia was sick.  Samia testified that she and the

Debtor were working at the Memoza Location on that date when she "dropped on the

floor in the middle of the store" and had to go to the emergency room.  The Debtor and

Samia both testified that Samia informed Jim Beland, the Franchisor district manager, of her illness.  According to the Debtor he did not inform Zacharakis or any of the Companies' members, employees or staff of the closure. He maintained that he did not ask the other partners for help as "nobody was talking to me." When Samia was asked whether she did anything to keep the stores open, she replied that there was no one who could have helped her run the stores at that point, and she "didn't know how long I was going to be away."

Zacharakis testified that he received a phone call from Jim Beland on March 17, 2014 informing him of the closure. Following that phone call, Zacharakis testified, he called Carlos, who owned and operated other Honey Dew franchises, and asked him to temporarily operate the locations "until we found someone to buy them." Carlos agreed. Zacharakis testified that he and Carlos met at the Memoza Location on March 17th whereupon they found that the store was closed and that Zacharakis's keys no longer worked. A locksmith was called, who changed the locks, Zacharakis testified.  He and Carlos then gained entry to the store. "We walked inside to look around. The registers were there.  The video equipment was there." According to Zacharakis, he did not give a key to the newly changed locks to the Debtor who was "nowhere to be found" and had "walked away" from the business at that point.  Zacharakis said it was necessary to gain access to the store to determine if it was ready to open for business, otherwise "I was in default [under the Franchise Agreement]." Zacharakis testified that upon gaining entry, everything appeared in order in the store and that "it was ready to open as soon as we could get people to run the store."

The Debtor testified that at some point on March 17th, he was informed by Samia that "somebody went into our stores." He admitted going to the Memoza Location and gaining entry by pushing in the back door which was locked. Once inside, he testified, "I took the two registers, the DVR [surveillance recording system] and the [donut] filler machine, things they couldn't operate [without] the following day." When asked why he did this, the Debtor replied: "Because I didn't know what was going on, why they changed the locks . . . ." When asked why he wanted the store closed, as opposed to getting someone in to operate it, he said "that's probably how I felt that day," and added, "It was a big mess after that." He said that he was very emotional about his wife's health and was upset. "Somebody came into the store and changed [the] locks and did all these things and I didn't know what was going on . . . if there was something that we would have known what was going maybe the outcome would have been different, sir."

The Debtor testified that he transported the items he took from the Memoza Location to his house and returned the equipment a few days later after speaking with counsel. Memoza had also owned a laptop computer which Samia would take back and forth from the Memoza Location to perform work (the "Laptop"). At his Deposition, the Debtor denied having possession of the Laptop and testified that he did not know what had happened to it. At trial, the Debtor testified that Samia had possession of the Laptop. When asked about the conflict between his trial and Deposition testimony, the Debtor said he was "frazzled" at the Deposition.

Carlos also testified about the events of March 17, 2014. He testified that when he first viewed the store, there was no "cash and balance sheets," no computer and "any

paperwork was totally gone." He recounted that when he returned to the location later,

he realized the cash registers, jelly filling machine and camera system were also missing

and that he called the police.[18] Carlos testified that he was not able to open the next day,

but opened a few days later. Following the incident, he testified, he filled out an

application for a criminal complaint against the Debtor and that the Debtor then returned

the equipment. He maintained that he never received the missing documents.

P. Business Records

The Debtor initially testified that, in addition to equipment, he also removed cash

register receipts from the Memoza Location on March 17th because he did not want them

"to get lost" and because he did not want someone else opening the Memoza Location.

He later clarified that he had approximately 100 boxes contained in garbage bags

containing the "register receipts for every week . . . or month," and that he did not remove

the register receipts or any other paperwork from the Memoza Location on March 17th.

Rather, he testified, he and Samia had been taking the receipts home "every so often" for

storage over a period of time and eventually turned them over to the Debtor's attorney.

With respect to other business records of the LLCs, the Debtor testified that he did not

take them, does not have them and does not know what happened to them. When Samia

was asked about the whereabouts of the cash register receipts she testified that because

---

[18] The police report relating to the incident was introduced into evidence and indicated
that the parties were advised by the Raynham Police that the matter was a civil one and
that they should contact their attorneys to resolve it.

of the ongoing attempts to sell the business to Sunil Patel, "I did not keep any receipts at the store," and she took them home every night.

Q.   The Settlement with Carlos

Carlos continued to run the Memoza Location and the M&Z Mobil Location after March 17, 2014, and, on May 23, 2014, he formally executed a Settlement Agreement with and among Memoza, M&Z, Zacharakis, the Debtor, Samia, Lina and Maria.  All members signed the Settlement Agreement on behalf of the LLCs, in their capacities as managers and/or members of the LLCs and individually. The Settlement Agreement contained an acknowledgement that the LLCs had been formerly operated by the Debtor.

The Settlement Agreement[19] provided, *inter alia*, that Carlos would directly pay amounts owed by the LLCs (and other responsible parties) to the MDOR and would pay employees for past due wages.  It further provided that Carlos would directly pay the Franchisor amounts owed by the LLCs and that he would obtain a release of all claims of the Franchisor against Zacharakis, the Debtor and Samia.  Lastly, it provided that Carlos would indemnify Zacharakis, the Debtor and certain other members with respect to debts owed to the landlord, Linear, and Perkins.  In consideration for Carlos's obligations under the Settlement Agreement, the Debtor and Zacharakis agreed to pay him $16,000 and $8,000, respectively.  As additional consideration, the Debtor, Samia, Zacharakis and Maria agreed to transfer their membership interests in Memoza and M&Z to Carlos, and

---

[19] The Settlement Agreement also resolved a lawsuit filed by Carlos against Memoza for breach of contract and through which he sought recovery under personal guarantees executed by Zacharakis and the Debtor for amounts owed to him by Memoza.

they agreed to resign from all positions at Memoza and M&Z.[20]   The Debtor, Samia, Lina,

Zacharakis and Maria also released Carlos from any and all claims, and Carlos, in turn,

gave them a general release. Both the Debtor and Samia testified that they did not read

the Settlement Agreement before signing it.

There was additional evidence introduced at trial regarding the potential

valuation the LLCs could have achieved had all cash been deposited in the bank accounts.

Such evidence, however, was speculative, unreliable and inconclusive.

R. The Debtor's Bankruptcy Case

Less than two weeks after the execution of the Settlement Agreement, on June 5,

2014, the Debtor filed his Chapter 7 bankruptcy petition.   Zacharakis testified that

following the Debtor's bankruptcy filing, he went to Debtor's counsel's office to review

the Memoza and M&Z sales receipts which had been in the possession of the Debtor:

"They were in plastic bags, but each box was separated by month and store and year." In

addition, Zacharakis testified that he obtained copies of bank statements showing bank

deposits "and we compared them to the store sales number [sic]."   According to

Zacharakis, there were some monthly periods where "no cash [was] being deposited into

the bank accounts."   He maintained that he also checked the Debtor's financial records

---

[20] In their Amended Stipulated Facts, the parties agreed in reference to the Settlement
Agreement that "the sole consideration for the assets was the assumption of debts due
by the entities by the purchasing entity and the indemnification for personal guaranty
of [Zacharakis]."   The Court construes this agreed to fact to be a reference only to the
consideration flowing to Zacharakis.

with information sheets prepared by the Franchisor which reflected that the total cash which had not been deposited equaled approximately $168,000 from 2012 through 2014.

S. The Cash Deposit Summary

The parties submitted into evidence an agreed upon chart summary (the "Summary") as an exhibit, pursuant to Fed. R. Evid. 1006, prepared by Zacharakis after review of bank deposit records, Franchisor data sheets and daily sales receipts from cash register tapes for both Memoza and M&Z. The Summary compares the amount of cash sales for each LLC, as reflected in the cash register tapes (after subtracting for payments made by bank cards), to the amount of actual bank deposits for the same month, on a monthly basis, from April 2012 through March 14, 2014 (the "Reporting Period"). The Summary reflects the "difference" between the register tapes and the bank deposits. According to the Summary, and as discussed above, cash deposits into the Memoza account ceased in September of 2013 and did not resume. Also, there were significant negative differences between receipts and deposits for most other months during the Reporting Period for Memoza, ranging from -$1,580.43 (April 2012) to -$24,361.46 (June 2013). For example, the Summary reflects the following with respect to Memoza during November of 2012:

| Nov. 2012 | Register Tapes: $21,090.31 | Bank Deposits: $12,706.13 | Difference:**-$8,384.18** |

The Summary also reflects that there were significant positive differences between the receipts and deposits for M&Z for most months during the Reporting Period. For example, the Summary reflects the following with respect to M&Z for the month of July in 2012 and 2013:

| July 2012 | Register Tapes: $16,558.88 | Bank Deposits: $22,019 | Difference: **+$ 5,460.88** |
| July 2013 | Register Tapes: $16,152.14 | Bank Deposits: $34,356 | Difference: **+$18,203.86** |

Zacharakis testified that the surplus deposits into the M&Z accounts did not offset the negative Memoza deposits. The Summary reflects that a total of $168,311.78 in cash was taken in by Memoza or M&Z during the Reporting Period which was not deposited into their bank accounts. The Summary was supported by Zacharakis's analysis of cash register receipts compared to cash deposits on a daily basis. That analysis reflects that there were only a few days during the entire Reporting Period on which the cash receipts for M&Z or Memoza nearly equaled the cash deposits into the bank accounts.

Zacharakis initially testified that his examination and analysis of the bank records led him to conclude that the Debtor stole cash from the business causing it to fail.

> Q: And the reason you believe this is because you and your wife added up the deposits in the cash register, compared it to the deposits in the bank – the money in the bank and found that the two didn't add up, correct?

> A: Yes:

Zacharakis maintained that this conclusion was reasonable because the Debtor "had control of the checkbooks and he was there daily and he was the one running the businesses." Later in the trial, Zacharakis's tempered his position and said the Debtor "could have taken it" although he admitted that he did not directly see him do it. When asked whether the other partners or employees could have stolen cash from cash registers, paid expenses or purchased products directly from cash on hand, Zacharakis conceded that it was possible although he did not think so. He also testified that he saw no vendor receipts indicating that expenses were paid in cash, that he never reviewed the

payroll records for Memoza or M&Z, and that the Debtor never told him that he was

paying people in cash. Zacharakis did not proffer an expert witness to interpret the

Summary or underlying records.

T. <u>Explanation for the Missing Cash</u>

The Debtor testified that he did not review the Summary prior to trial and did not

know if it was accurate, although his counsel stated that there was no dispute about the

calculations reflected in the Summary. He also said he did no investigation upon learning

that Zacharakis had claimed there was approximately $168,000 in missing cash deposits.

The Debtor was unable to provide any cogent explanation for why the cash receipts did

not match or approximate the cash deposits, as reflected in the Summary, although he

conceded that he wished he "had done a better job" and added "It [wasn't] just me. This

company was owned by all of us." The Debtor testified that Samia and Lina paid

themselves and employees and "bought stuff for the business" with cash, but he

conceded that such expenditures did not fully account for the approximately $168,000 in

missing cash deposits. He later testified that he was not on site at the stores enough to

make an informed explanation for the missing cash but that Samia would know. He also

said that some vendors, including Perkins, may have been paid in cash. Although Lina

testified that vendors, such as Perkins, were paid only by check, the Debtor said that he

and Samia sometimes obtained product directly from Perkins at its wholesale location on

a cash and carry basis and later sought reimbursement for their expenditures. "I would

either transfer it or Samia would transfer it into our account." Nonetheless, he said that

Perkins was mostly paid by check, and he could also not recall whether he ever made a

43

cash payment to Perkins or anyone else in excess of $100.  The Debtor emphatically maintained that he never took cash from the business other than for reimbursement of business expenses.

Samia also testified about why the amount of cash sales reflected by the cash registers did not equal the amount of cash deposited in the bank.  "[W]e used a lot of cash to pay a lot of people and a lot . . . of other things."  Samia said she made cash payments from the registers to her and Lina for their work (up to $500 per week for each) and their gas expenses (up to $50 per week for each) and that she also made cash payments to some of the bakers, to Perkins for cash and carry items and to employees whose paychecks had been dishonored.  She testified that "everybody knew what was going on" with respect to the expenses paid in cash, including Zacharakis who had access to the bank accounts. She maintained that she and Lina would take between $1,500 to $2,000 on a weekly basis in cash from the cash registers to pay themselves, the bakers, employees and Perkins.  She added that the LLCs incurred high bank fees because of returned checks.

The Debtor summed up his position with respect to the Companies' constant need for cash:

> Why would I try to hide the money? I don't understand. Why would you say that I'm trying to hide the money. There was never money to hide. Look at the business. There was never money to hide. You keep telling me that I'm hiding money. What money? There was never money from day one. I had to put money from day one into these accounts so they can run and you're telling me I'm hiding money. The DOR put a levy -- the accountants put a levy on my -- all my accounts. You know, I'm hiding money when I have all these accounts frozen and I can't do anything? I couldn't even afford food for my family."

He summed up his management style: "I was not a good business owner, sir."

## IV.    THE MAY 13, 2016 ORDER AND THE ISSUE OF STANDING

As discussed above and further below, the LLCs are not plaintiffs in this adversary proceeding, and Zacharakis did not assert or plead his claims against the Debtor as derivative claims on behalf of the LLCs. *See* Mass. Gen. Laws ch. 156C, § 56 (permitting members to bring suits on behalf of an LLC and in its name, subject to certain conditions). Zacharakis's claims against the Debtor are a mix of allegations which he claims caused losses to him both as a member of the LLCs and individually.  As a further complicating factor, the members of the LLCs transferred, prepetition, all of their membership interests in the LLCs to Carlos under the Settlement Agreement. The Court issued the May 13, 2016 Order to afford the parties the opportunity to address legal issues related to standing presented by the facts in this case.  Specifically, the Order required the parties to address the following issues: 1) whether Zacharakis has direct claims against the Debtor or whether such claims are owned by the LLCs and should have been asserted derivatively on behalf of the LLCs; 2) whether the current status of the LLCs precludes a derivative action against the Debtor; 3) whether Zacharakis established the existence of debt owed to him by the Debtor for purposes of § 523 (a)(2), (4) and/or (6); 4) what are the rights of the other members of the LLCs, who are not parties to this adversary proceeding, to any recovery asserted by Zacharakis; and 5) whether the Debtor, who never filed a dispositive motion, waived the defense of Zacharakis's lack of standing by failing to seek dismissal of the Complaint prior to trial.

## V.    POSITIONS OF THE PARTIES

A. <u>Zacharakis</u>

1.    Generally

Zacharakis maintains that the Debtor assumed control of the management and financial operations of the business and did so in an improper, deceptive and reckless manner and in violation of the fiduciary duty he owed to all members of the Companies. Zacharakis maintains, that as a result, he has been held personally liable for many obligations of the Companies and demands on him for monies owed continue although he did not quantify that amount.  He asserts that the Debtor owes him a debt equal to the amount of (1) cash which was not deposited by Memoza and M&Z into their bank accounts during the Reporting Period ($168,311.78)(the "Missing Cash"); (2) the value of equipment missing from the M&Z Prestige Location ($7,500) (the "Prestige Equipment"); (3) the amounts Zacharakis loaned the LLCs ($84,211.16) (the "Loans"), which he asserts he would not have loaned had he known that the full amount of cash sales was not being deposited into the LLCs' bank accounts; and (4) the amount he paid to Carlos under the Settlement Agreement to assume debts of the LLCs ($8,000) (the "Carlos Payment"),[21] for a total of $268,022.04.  Zacharakis asserts that these obligations are excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (4) and/or (6), although he did not, either in the Complaint or in the Joint Pretrial Memorandum, align specific allegations against

---

[21] Zacharakis testified at trial that he had to pay Carlos $8,500 in connection with the Settlement Agreement; the actual amount was $8,000.

the Debtor with the respective elements of claims under 11 U.S.C. § 523(a)(2)(A), (4) and/or (6).

        2.       Standing and the Existence of a Debt

In Zacharakis's supplemental memorandum filed in response to the Court's Order dated May 13, 2016, he expounded upon his standing to assert claims against the Debtor. With respect to the Loans, he maintains that even though the funds "passed through" the LLCs, the Debtor is not shielded from a direct claim because the Loans were personally solicited by the Debtor and procured through false pretenses, relying on Husky Int'l Elec., Inc. v. Ritz, __U.S. __, 136 S. Ct. 1581, 1589 (2016) ("If [a] recipient later files for bankruptcy, any debts 'traceable to' the fraudulent conveyance . . . will be nondischargable under § 523(a)(2)(A))." Zacharakis maintains that a direct action against the Debtor, rather than a derivative action in the name of the LLCs, is appropriate where, as here, he advanced the Loans personally and he, not the LLCs or the other members, suffered distinct and specific harm for the loss, citing Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 593, 328 N.E.2d 505 (1975) (holding that shareholders in a close corporation owe one another a fiduciary duty of "utmost good faith and loyalty"), and Fronk v. Fowler, 456 Mass. 317, 332 n.23, 923 N.E.2d 503 (2010) ("The availability of suits on behalf of individual partners (or stockholders) is premised on the difficulty of proving harm to the partnership (or corporation) as a whole because only one or a handful of partners have been harmed.").

With respect to the issue of whether the current status of the LLCs precludes a derivative action, Zacharakis advances a confusing argument.  He maintains that

"corporate existence [of the LLCs] was never terminated" and that a derivative suit can still be maintained, even though he has not asserted one. In support, he relies on Diamond v. Pappathanasi, 78 Mass. App. Ct. 77, 93, 935 N.E.2d 340 (2010) (in order to maintain a derivative action, one must strictly retain an ownership interest in the company on whose behalf the action is brought) (citing Billings v. GTFM, LLC, 449 Mass. 281, 290-94, 867 N.E.2d 714 (2007)), despite the fact that Zacharakis no longer holds any interest in the LLCs following the transfer of those interests to Carlos under the Settlement Agreement.

With respect to Zacharakis's standing to assert an exception to discharge for a debt owed to him by the Debtor with respect to the Missing Cash and the Prestige Equipment, he maintains that "If the present claims are qualified as a derivative action, those claims may be asserted derivatively by Zacharakis as a Member." He offers no legal support for this theory and simply asserts that "the missing cash and equipment is a non-dischargeable debt to the LLCs . . . ." adding that the other members of the LLCs have no right to participate in any recovery awarded to Zacharakis for his direct claims although they may have a claim for a proportionate award for the "derivative claims of Zacharakis." In such a case, he asserts, he would be entitled to attorneys' fees expended by him to achieve an award against the Debtor, citing numerous cases involving the award of attorneys' fees to a party who successfully brings a derivative action.

With respect to the issue of whether the Debtor waived the defense of Zacharakis's lack of standing, Zacharakis argues at length that he, individually, has standing to assert claims against the Debtor. Although his argument is difficult to follow, he appears to

contend that he can now assert derivative claims on behalf of the LLCs with respect to the Missing Cash and the Prestige Equipment because he owned his membership interests in the LLCs at the time of the LLCs' injury, citing Fed. R. Civ. P. 23.1, the procedural rule governing derivative actions by shareholders, and In re Galena Biopharma, Inc. Derivative Litig., 83 F. Supp. 3d 1047, 1077 (D. Or. 2015) ("Under Rule 23.1, a plaintiff must allege that he or she '"was a shareholder or member at the time of the transaction complained of."'").  He adds that his failure to comply with Rule 23.1 is not a fatal pleading defect because the Debtor waived any right to such a defense when he did not seek dismissal of the Complaint prior to trial, relying on a number of cases where compliance with some of the requirements of Rule 23.1 was deemed waived where defendants did not timely object or file a dispositive motion prior to a trial on the merits.

Lastly, Zacharakis relies on the doctrine of *jus tertii* standing and maintains that he should not be constrained by prudential limitations on his assertion of the LLCs' rights against the Debtor in a case such as this where practical obstacles prevent the LLCs from asserting rights on their own behalf, citing Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico, 906 F.2d 25, 37 (1st Cir. 1990) ("'Where practical obstacles prevent a party from asserting rights on behalf of itself, . . . the Court has recognized the doctrine of *jus tertii* standing. . . . [and] considers whether the third party has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement, and whether, as a prudential matter, the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal.'") Id. at 37 (quoting Sec'y of State of Md. v. Joseph H. Munson Co. Inc., 467 U.S. 947, 956, 104 S. Ct. 2839, 2846 (1984)).

B. <u>The Debtor</u>

1.   Generally

The Debtor maintains that he is not responsible for the failure of the business and that he became involved in business operations "only out of desperation" to help Samia and Lina.  The Debtor contends that Zacharakis, who had experience in operating retail businesses, breached his fiduciary duty when he failed to assume operations of the business while he "had managerial control, ownership control and [a] relationship with the LLCs' lawyer, accountant and bookkeeper." With respect to Count I of the Complaint, based on § 523(a)(4), the Debtor asserts that Zacharakis did not establish that the Debtor committed fraud or defalcation while acting in a fiduciary capacity or converted any funds, committed larceny or embezzled any funds.  He argues that the business was undercapitalized from its inception, that Zacharakis failed to establish that the Debtor stole cash from the business, and that the total cash paid to employees, to Perkins and other suppliers, and to Samia and Lina "more than explains the cash discrepancy" reflected in the Summary.

With respect to the allegations contained in Count II of the Complaint based on § 523(a)(2)(A), the Debtor asserts that "the evidence is void of any misrepresentations made by [the Debtor] to Zacharakis."   With respect to Count III, the Debtor maintains that Zacharakis's claim under § 523(a)(6) is based on the same allegations as Counts I and II. In sum, the Debtor maintains that Zacharakis failed to sustain his burden of proof, citing <u>deBenedictis v. Brady–Zell (In re Brady–Zell)</u>, 756 F.3d 69, 72 (1st Cir. 2014) ("When the

weight of the evidence is in equipoise, a party cannot plausibly be said to have carried the devoir of persuasion.").

2.   Standing and the Existence of a Debt

With respect to the standing issues, the Debtor first asserts that Zacharakis's claims against the Debtor with respect to the Missing Cash and the Prestige Equipment are claims that belong to the LLCs because they allege wrongs against, and damages to, the LLCs, citing Bessette v. Bessette, 385 Mass. 806, 809–10, 434 N.E.2d 206, 208 (1982) (generally, a shareholder's claim for breach of fiduciary duty by another shareholder must be brought derivatively rather than directly when the alleged breach of duty was owed to the corporation and not the individual shareholder). He asserts that Zacharakis has not established that he sustained special or unique injuries, as opposed to injuries suffered by the LLCs and the other members generally, and that he therefore does not have any direct claims against the Debtor.

Second, the Debtor contends that Zacharakis has no standing to assert any derivative claims on behalf of the LLCs against him because Zacharakis does not have a "continuous" membership interest in the LLCs. He adds that Carlos was the only member of the LLCs on the petition date and that his general release of the Debtor in the Settlement Agreement precludes any claim by Zacharakis on behalf of the LLCs against him. Given these facts, the Debtor asserts, Zacharakis lacks constitutional standing to bring derivative claims against him, a defect which is not waivable by him, citing Lacourse Builders, LLC v. D'Anello, (In re D'Anello), 477 B.R. 13 (Bankr. D. Mass. 2012).

With respect to the Loans, the Debtor argues that no debt exists from the Debtor to Zacharakis because the Loans were made to the LLCs and not the Debtor personally. Likewise with respect to the Missing Cash and Prestige Equipment, the Debtor maintains that Zacharakis failed to establish a debt owed to him by the Debtor.

## VI.  DISCUSSION

### A. Standing and the Existence of a Debt-The Missing Cash and Prestige Equipment

Before the Court can determine whether any of the exceptions to discharge have been proven by Zacharakis, it must first determine the threshold and related issues of whether Zacharakis has standing to assert claims against the Debtor and whether there is any debt owed by the Debtor to Zacharakis.

Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498 (1975). A defect in standing must be addressed by the court, whenever it becomes apparent. Sentinel Trust Co. v. Newcare Health Corp. (In re Newcare Health Corp.), 244 B.R. 167, 170 (B.A.P. 1st Cir. 2000) (citing U.S. v. AVX Corp., 962 F.2d 108, 116 n.7 (1st Cir. 1992)).  In Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130 (1992), the Supreme Court stated that constitutional standing requires proof of three elements:

> First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical. . . .  Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560–61 (quotations and internal citations omitted). The inquiry into standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth, 422 U.S. at 498, 95 S. Ct. at 2205. "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." Id. "Apart from this minimum constitutional mandate, the Supreme Court recognizes other limits '. . . on the class of persons who may invoke the courts' decisional remedial powers.'" In re Newcare Health Corp., 244 B.R. at 170 (citing Warth, 422 U.S. at 499, 95 S. Ct. at 2197). In Newcare, the Bankruptcy Appellate Panel for the First Circuit expounded on prudential limitations:

> These considerations, which militate against standing, principally concern *whether the litigant (1) asserts the rights and interests of a third party and not his or her own,* (2) presents a claim arguably falling outside the zone of interests protected by the specific law invoked, or (3) advances abstract questions of wide public significance essentially amounting to generalized grievances more appropriately addressed to the representative branches.

Newcare, 244 B.R. at 170 (quoting Benjamin v. Aroostook Medical Center, Inc., 57 F.3d 101, 104 (1st Cir. 1995))(emphasis in original). Unlike constitutional standing, prudential standing can be waived if it is not properly or timely raised. In re D'Anello, 477 B.R. 13, 22 (Bankr. D. Mass. 2012).

For the reasons stated below, the Court finds that Zacharakis has neither constitutional nor prudential standing to assert claims against the Debtor for the Missing Cash or the Prestige Equipment, whether derivatively or directly, and that no debt for

those losses is owed by the Debtor to Zacharakis.  Accordingly, because the Debtor does

not owe a debt to Zacharakis, there is no debt to except from discharge. [22]

Zacharakis filed the Complaint "individually and as he is Member of Memoza

Enterprises, LLC and M&Z Enterprises, LLC."   In his Complaint, Zacharakis did not

name either LLC as a plaintiff, and he did not expressly assert his exception to discharge

claims against the Debtor in the Complaint as a derivative action on behalf of the LLCs.

In some portions of the Complaint, he alleges damages to the LLCs, however, the prayer

for relief with respect to the surviving Counts I through III provides: "WHEREFORE,

*Plaintiffs* respectfully request this Honorable Court: 1.  As to Counts I, II and III, determine

the debt owed to the *Plaintiffs* by the Debtor in the amount of $269,423.38 as not

dischargeable pursuant to 11 U.S.C. §§ 523 (a)(4), 523 (a)(2)(A), and 523 (a)(6). . . . "

(emphasis added).  The term "Plaintiffs" is not defined in the Complaint and appears

only once in the foregoing quoted prayer for relief.  Zacharakis is defined as the

"Plaintiff" in the Complaint, and the Court concludes that the reference to "Plaintiffs" in

the prayer for relief is not substantive and is a typographical error; it is solely a reference

to Zacharakis. Accordingly, the Court concludes that Zacharakis is asserting only direct

claims against the Debtor in this adversary proceeding and not derivative ones on behalf

of the LLCs, nor could he as discussed below.

---

[22] *See* 11 U.S.C. § 523(a) which provides: "A discharge under section 727, . . . of this title
does not discharge an individual debtor from *any debt*-- . . ." 11 U.S.C. § 523(a)(emphasis
added).

The next inquiry is whether Zacharakis has standing to assert direct claims against the Debtor with respect to the Missing Cash or the Prestige Equipment or whether those claims, which involve alleged wrongs which injured Zacharakis (and the other members), as well as the LLCs, are truly the property of the LLCs and should have been asserted as a derivative action on their behalf.

In Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 328 N.E. 2d 505 (1975), a case involving a "freeze out" of a minority shareholder, the Massachusetts Supreme Judicial Court held that "stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another" and that "the standard of duty owed by partners to one another [is] the 'utmost good faith and loyalty.'" Id. at 593 (quoting Cardullo v. Landau, 329 Mass. 5, 8, 105 N.E.2d 843 (1952)) (footnotes omitted).  Shareholders (or in this case members)[23] may sue each other individually to enforce that duty, however, "[w]hen the alleged wrong committed by a partner harms the partnership rather than another partner individually, the appropriate approach is to file a derivative claim." Fronk v. Fowler, 456 Mass. at 332 n.23, (citing Bessette v. Bessette, 385 Mass. at 806–07, 809-10).  In Bessette, the Massachusetts Supreme Judicial Court held that a direct, personal action by minority stockholders against the majority stockholder for excessive salary payments, and

---

[23] Holders of limited liability company interests in a closely held Massachusetts LLC owe each other the same fiduciary duty that shareholders of a closely held Massachusetts corporation owe to each other.  Butler v. Moore, Civil No. 10-10207-FDS, 2015 WL 1409676, at *60-*61 (D. Mass. March 26, 2015).  See also Reiss v. McQuillin (In re McQuillin), 509 B.R. 773, 788 (Bankr. D. Mass. 2014).

payments on notes which failed for lack of consideration, must be dismissed because "the

right to recover the overpayments belongs to the corporation" and such a claim for relief

must be asserted in a derivative action and not as a direct action for breach of fiduciary

duty. Bessette, 385 Mass. at 809-10. In Blasberg v. Oxbow Power Corp., 934 F. Supp. 21

(D. Mass. 1996), the court examined the difference between direct and derivative claims:

> For example, if a plaintiff alleges mismanagement of funds, embezzlement
> or breach of fiduciary duty resulting in a diminution of the value of the
> corporate stock or assets, the claim is one held by the corporation itself, and
> is thus derivative if brought by an investor. The plaintiff's injury would
> accrue due to his role as investor in the corporation, in the form of a loss in
> investment value. In such a case, however, the corporation sustains an
> injury and has a right of claim. Indeed, any judgment on such a claim would
> be paid to the corporation so that the corporation's financial status would
> be restored. *See, e.g.,* Vincel v. White Motor Corporation, 521 F.2d 1113,
> 1118–1119 (2d Cir.1975); and Papilsky v. Berndt, 466 F.2d 251, 255 (2d Cir.
> 1972), *cert. denied*, 409 U.S. 1077, 93 S. Ct. 689, 34 L.Ed.2d 665 (1972). In
> contrast, if a plaintiff alleges that she, as an individual investor, was misled
> or defrauded in the purchase of her investment, this kind of claim is a
> "direct" one. That many investors might have been misled, as the plaintiff
> was, or that the plaintiff might only be minimally injured, does not convert
> the claim to a derivative one. The claim remains a direct one for wrongs to
> individual investors rather than to the corporate entity. Payment on such a
> claim would be made not to the corporate entity but to the plaintiff-
> investors in order to compensate them for their individual losses.

Id. at 26. *See also* Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C., 405

Mass. 506, 513 , 541 N.E.2d 997, 1002 (1989) (action by shareholder against law firm and

its members was a claim for harm to the corporation and "properly asserted only through

a derivative action brought on behalf of the corporation.").

The Missing Cash and the Prestige Equipment constituted property of the LLCs,

not Zacharakis. The alleged embezzlement and misappropriation by the Debtor of those

assets did not harm Zacharakis directly. Rather, any losses related to these assets were

suffered directly by the LLCs, and Zacharakis's losses were an indirect loss of his

investment value in the LLCs.  As the LLCs are the owners of the claims relating to the

Missing Cash and the Prestige Equipment, the claims should have been asserted as a

derivative action on behalf of the LLCs and not as a direct action by Zacharakis against

the Debtor.

The allegations here are analogous to those asserted in White v. Whittle (In re

Whittle), 449 B.R. 427 (Bankr. M.D. Fla. 2011), in which members of a limited liability

company brought an action against the debtor who had been the managing member of

the LLC and who controlled all of its bank accounts, assets and records. The plaintiffs

asserted that the debtor used funds of the LLC improperly to pay himself excessive

compensation and reimburse himself for expenses and personal (nonbusiness) purposes.

The debtor moved to dismiss the plaintiffs' exception to discharge action arguing that

they lacked standing to pursue derivative claims properly asserted only by the LLC.  The

court concluded that the essential question was whether the plaintiffs were creditors of

the debtor.  It stated:

> Plaintiffs base their Section 523(a)(4) claim on allegations that Whittle's
> misuse of the LLC's monies to fraud, embezzlement, or larceny.
> Taking these allegations as true, the Court absolutely could draw
> reasonable inferences that [the LLC] was damaged by Whittle's diversion
> of the LLC's funds. [The LLC] indeed may have a claim against Whittle. The
> alleged facts, however, do not support a conclusion that plaintiffs, as
> members of [the LLC], are owed a debt by Whittle.

Id. at 430. The court added: "Plaintiffs do not allege facts that support a conclusion that

they were injured individually; plaintiffs are not entitled to recover directly any damages

that were inflicted on the LLC by Whittle's misuse of LLC property" because they failed

to avail themselves of a Florida statute establishing the right of a member to bring a derivative action on behalf of an LLC. Id. at 430 n.14.

To the extent Zacharakis relies on a direct claim against the Debtor with respect to the Missing Cash and the Prestige Equipment because a derivative claim on behalf of the LLCs is unavailable or difficult to establish, as was the case in Donahue, 367 Mass. at 589 n.14, the Court finds that argument lacks merit. First, this Court must adhere to the general rule in Massachusetts, articulated in Bessette that where a right of recovery for a shareholder's wrongdoing belongs to a corporation, a claim for relief must be asserted in a derivative action and not as a direct action for breach of fiduciary duty. Id. at 809–10. Here, Zacharakis failed to establish that he suffered any damages separate and distinct from the LLCs and the other members with respect to the Missing Cash and Prestige Equipment. Second, the vulnerability of minority stockholders which was controlling in Donahue is not present in this case. Indeed, Zacharakis was a majority member of Memoza and owned a membership interest in M&Z equal to that owned by the Debtor, and he could have exercised his rights as a manager of Memoza and a member of M&Z at any time to address the Debtor's mismanagement of the LLCs. Third, the Court rejects Zacharakis's suggestion that the other members, who are not parties to this adversary proceeding, may have a proportionate claim to any recovery he achieves, subject to his right to seek costs and for attorneys' fees. Such a proposal does not cure the deficiencies in the Complaint. Moreover, the members of the LLCs are no longer able to bring a derivative action on behalf of the LLCs, as discussed further below.

To the extent Zacharakis attempts to recast his Complaint to *now* assert derivative claims on behalf of the LLCs with respect to the Missing Cash and the Prestige Equipment, such an attempt is impermissible and also would be futile.  First, Zacharakis did not comply with the applicable statute and rules of procedure governing derivative actions.  Section 56 of Mass. Gen. Laws ch. 156C permits any member of an LLC to sue on its behalf provided that such member is authorized to sue by "the vote of members who own more than fifty percent of the unreturned contributions," excluding those members who have an interest in the outcome of the suit that is adverse to the interest of the LLC. Mass. Gen. Laws ch. 156C, § 56(a).  Additionally, Fed. R. Civ. P. 23.1, made applicable hereto by Fed. R. Bankr. P. 7023.1, governs the prerequisites and pleading requirements for derivative actions. The rule requires that a derivative action be instituted by a verified complaint which, among other things, must "allege that the plaintiff was a shareholder or member at the time of the transaction complained of . . . ." (the contemporaneous ownership requirement) and state with particularity, "any effort, by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members;" (the presentment requirement). Fed. R. Civ. P. 23.1(b). Zacharakis did not comply with the requirements of this Rule or Mass. Gen. Laws ch. 156C, § 56.

Second, none of the past members of the LLCs, including Zacharakis, can pursue derivative claims on the LLCs' behalf against the Debtor.[24] Their rights to pursue claims

---

[24] The Court notes that the LLCs themselves also are unable to assert claims against the Debtor for losses involving the Missing Cash and the Prestige Equipment as they did

for the Missing Cash and the Prestige Equipment on behalf of the LLCs ended when they

transferred their membership interests to Carlos prepetition. As discussed above, Rule

23.1 has a contemporaneous ownership requirement which Zacharakis undoubtedly

satisfied.  There is, however, an additional standing requirement in a derivative suit,

namely: "the requirement that the plaintiff remain an owner during the pendency of his

suit. It might be termed the 'continuing ownership requirement' in order to distinguish

it from the 'contemporaneous ownership requirement.'" Billings v. GTFM, LLC, 449

Mass. 281, 291 n.21, 867 N.E.2d 714 (2007) (a party who loses his interest in a corporate

entity loses standing to pursue derivative claims).  See also Schaeffer v. Cohen, Rosenthal,

Price, Mirkin, Jennings & Berg, P.C., 405 Mass. 506, 513 , 541 N.E.2d 997, 1002 (1989), in

which the court ordered the dismissal of a shareholder's derivative claim for want of

standing after she had sold her stock in the company in whose right she proceeded.  Other

than Carlos, none of the LLCs' original members, including Zacharakis, had an

ownership interest in the LLCs on the petition date or the date the adversary proceeding

was commenced.

Zacharakis appears to argue that because he established ownership of

membership interests in the LLCs at the time the LLCs were injured and satisfied the

contemporaneous ownership requirement of Rule 23.1, that he can *now* assert derivative

---

not timely seek an exception to the Debtor's discharge and thus are barred from
pursuing claims against him. *See* 11 U.S.C. § 523(c), Fed. R. Bankr. P. 4007(c).  Carlos,
who gave the Debtor a general release under the Settlement Agreement, also would not
be able to assert a derivative claim against the Debtor. Moreover, he failed to do so,
despite being listed as a creditor on the Debtor's schedules, and also is barred by the
Debtor's discharge.

claims on the LLCs' behalf with respect to the Missing Cash and the Prestige Equipment because the presentment and verification requirements of Rule 23.1 can be waived when defendants fail to assert those requirements prior to trial, *see* <u>Diamond v. Pappathanasi</u>, 78 Mass. App. Ct. 77, 90, 935 N.E.2d 340 (2010).  Whether or not Zacharakis's Complaint was compliant with Rule 23.1 or Mass. Gen. Laws ch. 156C, § 56, or whether the Debtor waived such compliance by failing to object or to file a dispositive motion prior to trial is irrelevant under the facts of this case as neither Zacharakis nor any of the other members (other than Carlos) has owned an interest in the LLCs during the pendency of this adversary proceeding.  To the extent Zacharakis now seeks to recast his Complaint as one asserting derivative claims on behalf of the LLCs with respect to the Missing Cash and the Prestige Equipment, the Court finds that he cannot and, moreover, it would be futile to do so in light of the absence of the continuous ownership requirement.

The Court concludes that Zacharakis has no constitutional or prudential standing to assert derivative claims on behalf of the LLCs with respect to the Missing Cash or the Prestige Equipment against the Debtor.  He simply has no claim[25] and, accordingly, there is no case or controversy, compensable injury to redress, or legally protected interest to pursue at this time because *no one* has standing to assert those rights against the Debtor. The members, including Zacharakis, do not meet the continuous ownership requirement

---

[25] A claim means "a right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured;" 11 U.S.C. § 101(5)(A).

necessary to maintain a derivative action, and, in the case of Carlos, a general release precludes such an action.

In addition, Zacharakis's assertion of *jus tertii* standing would be inappropriate in a case where there is no injury of a third party to redress. Even if Zacharakis were able to establish constitutional standing, the unique facts of this case weigh against a waiver of prudential standing. Although the Debtor did not file a dispositive motion in this adversary proceeding, many of the subtleties surrounding the standing issues were not apparent until after the entire record was presented at trial, at which time the Court afforded the parties the opportunity to brief the legal issues. Moreover, the Court cannot permit Zacharakis to assert barred claims. Accordingly, there is no threshold debt for purposes of determining an exception to discharge pursuant to 11 U.S.C. § 523 with respect to any losses sustained relating to the Missing Cash and the Prestige Equipment. *See* S&L Enters I, LLC, v. Eisaman (In re Eisaman), 387 B.R. 219, 224 (Bankr. N.D. Ind. 2008) ("The provisions of § 523(a) do not make a debtor liable to a creditor . . . Without . . . an obligation [owing by the debtor to the creditor], there is no debt which could be excepted from the scope of the debtors' discharge.") (citing In re Sieger, 200 B.R. 636, 639 (Bankr. N.D. Ind. 1996)).

B.    Standing and the Existence of a Debt-The Loans and the Carlos Payment

The Court turns next to Zacharakis's claims based on losses relating to the Loans and the Carlos Payment which are not as clearly demarcated as "corporate claims" because they involved some degree of personal and individual loss by Zacharakis which was not shared equally by the other members. Zacharakis has asserted that all debts

owed to him are excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) (Count I),

(a)(2)(A) (Count II) and/or (a)(6) (Count III).  The Court will consider each count with

respect to the Loans.  The Court will not consider the above Counts with respect to the

Carlos Payment as Zacharakis has advanced no theory for holding the Debtor liable for

amounts he paid to Carlos, especially where the Debtor was required to pay Carlos twice

the cash amount Zacharakis was responsible for under the Settlement Agreement.

Moreover, the Carlos Payment claim appears to be a further complaint by Zacharakis

about the value of his investment in the LLCs, which cannot form the basis of a direct

claim.  The Court will also not consider any evidence introduced at trial regarding the

valuation the LLCs could have achieved had all cash been deposited as such evidence

was speculative, unreliable and inconclusive.

       C.    <u>Count I (§ 523(a)(4))</u>

       1.   Applicable Law

Section 523(a)(4) provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual
> debtor from any debt-- . . .
>
> > (4) for fraud or defalcation while acting in a fiduciary capacity,
> > embezzlement, or larceny; . . .

11 U.S.C. § 523(a)(4).  The standard of proof of each element of a § 523 claim is by a

preponderance of the evidence. <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 787 (1st Cir. 1997)

(citing <u>Grogan v. Garner</u>, 498 U.S. 279, 291, 111 S. Ct. 654 (1991)). The burden of proof and

the burden of production as to each element rests with the party contesting the

dischargeability of a particular debt under Bankruptcy Code § 523. <u>Palmacci</u>, 121 F.3d at

788.

> 2.    Fraud or Defalcation While Acting in a Fiduciary Capacity

Section 523(a)(4) of the Bankruptcy Code prohibits the discharge of an individual

debtor from any debt for "fraud or defalcation while acting in a fiduciary capacity" 11

U.S.C. § 523(a)(4).  In order for Zacharakis to prevail under this clause of § 523(a)(4), he

must prove (1) that the debt in issue arose while the Debtor acted in a fiduciary capacity

and (2) the debt arose from his fraud or defalcation.

The issue of whether a party is "acting in a fiduciary capacity" within the meaning

of § 523(a)(4) is one of federal law. <u>Petrucelli v. D'Abrosca (In re D'Abrosca)</u>, No. 10–062,

2011 WL 4592338, at *5 (B.A.P. 1st Cir. Aug. 10, 2011).  "In order to be acting as a fiduciary,

a party must be acting pursuant to an express or technical trust, not a trust which the law

implies from a contract." <u>Breed's Hill Ins. Agency v. Fravel (In re Fravel)</u>, 485 B.R. 1, 14

(Bankr. D. Mass. 2013) (citing <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. 328, 333, 55 S. Ct.

151 (1934)). Zacharakis has not alleged the existence of an express trust, which requires

"an explicit declaration of trust, a clearly defined trust *res*, and an intent to create a trust

relationship." <u>Raso v. Fahey (In re Fahey)</u>, 482 B.R. 678, 687 (B.A.P. 1st Cir. 2012) (quoting

<u>Gehlhausen v. Olinger (In re Olinger)</u>, 160 B.R. 1004, 1014 (Bankr. S.D. Ind. 1993)).  He

has asserted that the Debtor was the "sole fiduciary" for the operations of the LLCs

"holding a position of trust and confidence and working for the benefit of all Members

including Zacharakis." The issue then is whether the parties' relationship constituted a

technical trust, which "'arises under statute or common law.'" <u>Fahey</u>, 482 B.R. at 688

(quoting In re D'Abrosca, 2011 WL 4592338, at *5) (citing Farley v. Romano (In re Romano), 353 B.R. 738 (Bankr. D. Mass. 2006); M–R Sullivan Mfg. Co. v. Sullivan (In re Sullivan), 217 B.R. 670, 674 (Bankr. D. Mass. 1998); Collenge v. Runge (In re Runge), 226 B.R. 298, 305 (Bankr. D. N.H. 1998)). State law is relevant in considering whether such a trust exists, In re D'Abrosca, 2011 WL 4592338 at *5, but "one must . . . ascertain whether the relationship was imbued with attributes giving rise to, in substance, a trust." LaPointe v. Brown (In re Brown), 131 B.R. 900, 905 (Bankr. D. Me. 1991)).  The existence of corporate fiduciary duties alone does not establish fiduciary capacity for purposes of § 523(a)(4), Denton v. Hyman (In re Hyman), 320 B.R. 493, 510 (Bankr. S.D. N.Y. 2005), aff'd 335 B.R. 32 (S.D. N.Y. 2005).

The United States Bankruptcy Appellate Panel for the First Circuit in In re D'Abrosca, noted a split of authority as to the fiduciary duties owed to and by members of limited liability companies.  See D'Abrosca, 2011 WL 4592338 at *7 (citing Davis v. Olson (In re Olson), No. 10–2056, 2011 WL 1832751, *5 (Bankr. W. D. Mo. May 13, 2011) (declining to find "fiduciary capacity" between members of a limited liability company because neither operating agreement nor statute established a relationship sufficient for § 523(a)(4)); Walker v. Silvonen (In re Silvonen), No. 10–00050, 2011 WL 2837507 (Bankr. D. Mont. July 14, 2011) (same), and Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986) (concluding California case law established partners were trustees over partnership assets)). See also Reiss v. McQuillin (In re McQuillin), 509 B.R. 773, 788 (Bankr. D. Mass. 2014) (finding that a member and manager of a Massachusetts LLC acted in a fiduciary

capacity with respect to the LLC and the co-manager and member for purposes of §
523(a)(4)).

This Court also has addressed the issue of corporate fiduciaries in the context of §
523(a)(4) in Farley v. Romano (In re Romano), 353 B.R. 738 (Bankr. D. Mass. 2006) and,
most recently, in Hutton v. Vasa (In re Vasa), 14-1173, 2016 WL 890130 (Bankr. D. Mass.
March 8, 2016). In Romano, this Court observed that a "fiduciary capacity for purposes
of § 523(a)(4) could be established by the existence of a contract and substantial
ascendancy of one shareholder over another as an alternative to an express or technical
trust." In re Romano, 353 B.R. at 762–63 (emphasis added) (relying on In re Frain, 230 F.3d
1014, 1017-18 (7th Cir. 2000) (Court found that knowledge of day-to-day operations was
insufficient in itself to establish a position of ascendancy and concluded that "a fiduciary
relationship was created by the structure of the corporation under the shareholder
agreement[.]"). This Court concluded that for purposes of § 523(a)(4), the debtor, who
was the president and a fifty-percent shareholder of a closely held corporation, did not
commit fraud or defalcation while acting in a "fiduciary capacity" vis-a-vis the
corporation's other fifty-percent shareholder where no express trust existed with respect
to the debtor's fiduciary duty to the other shareholder, and the various agreements
executed by the parties did not give the debtor more knowledge or power than the other
shareholder. In re Romano, 353 B.R. at 764.

In Vasa, this Court examined "fiduciary capacity" in the context of a closely held
Massachusetts professional corporation, a law firm, equally owned by the debtor, Vasa,
and the plaintiff, Hutton. The Court determined that the debtor acted in a fiduciary

capacity for purposes of § 523(a)(4) with respect to his duties as an overseer of the firm's lawyer's trust account (IOLTA), a trust account for the firm's clients, and business bank accounts which the Court found were "imbued with the same trust characteristics as the IOLTA account" because they were funded primarily through the IOLTA account. Id. at *11.

Zacharakis faces a number of obstacles in his assertion of claims against the Debtor for fraud or defalcation while acting in a fiduciary capacity pursuant to § 523(a)(4). Although the Debtor may have owed Zacharakis and the other members of the Companies a fiduciary duty, Zacharakis did not establish that the Debtor acted as a trustee with respect to the funds advanced through the Loans. Unlike the case in Vasa which involved a lawyer's trust account, Zacharakis did not establish that any generalized fiduciary duties of the Debtor of trust, confidence and fair dealing with regard to the Loans were imbued with attributes giving rise to, in substance, a trust with a clearly defined trust res. Indeed the Memoza Operating Agreement actually contained a provision eliminating fiduciary obligations among the members. Nor was the Debtor in a position of "substantial ascendancy" over Zacharakis pursuant to the Operating Agreements or any other agreement to which Zacharakis has directed this Court's attention. Zacharakis pointed to no agreement which gave the Debtor more power or knowledge than he had. To the contrary, the Memoza Operating Agreement conferred overall management and control over the business of that LLC in the Managers, a title held by Zacharakis, not the Debtor. The M&Z Operating Agreement provided that management of the LLC was vested in the members according to their Percentage

Interests, and the Debtor and Zacharakis each held a 45% Percentage Interest in that LLC. Even though the Debtor may have had more knowledge than Zacharakis with respect to the day-to-day operations of the LLCs, that alone is insufficient to establish a position of ascendancy. In re Frain, 230 F.3d at 1017-18. While the Debtor was effectively the manager of the LLCs and controlled the checkbooks, Zacharakis had access to, knowledge of, and information about the business. Indeed, he permitted the Debtor to assume the role of *de facto* manager through his deliberate failure to become involved in management until the fall of 2012, when he first discovered banking irregularities. For all of the above reasons, the Court finds that Zacharakis's assertion of any damages against the Debtor in Count I of the Complaint did not involve a clearly defined trust *res* and did not arise in the course of a fiduciary relationship for purposes of § 523(a)(4). To the extent Count I is based on "fraud or defalcation while acting in a fiduciary capacity," the Count fails.

3.  Embezzlement or Larceny

In addition to excepting debts from discharge which arise by fraud or defalcation while acting in a fiduciary capacity, § 523(a)(4) also prohibits the discharge of debts incurred by embezzlement or larceny.[26] "Embezzlement does not require the existence of a fiduciary relationship. Romano, 353 B.R. at 765 (citing Chapman v. Pomainville (In

---

[26] Larceny is distinguished from embezzlement in that a claim for larceny is based on the unlawful original acquisition of possession by the debtor. Consumer United Ins. Co. v. Bustamante (In re Bustamante), 239 B.R. 770, 777 (Bankr. N.D. Ohio 1999). Although the term "larceny" is contained in the Complaint, Zacharakis appears to rely only on embezzlement.

re Pomainville), 254 B.R. 699 (Bankr. S.D. Ohio 2000)).  Embezzlement is not defined in §

523 or elsewhere in the Bankruptcy Code.  The United States Court of Appeals for the

First Circuit, in the context of § 523(a)(4), defined embezzlement as "the fraudulent

conversion of the property of another by one who is already in lawful possession of it."

Sherman v. Potapov (In re Sherman), 603 F.3d 11, 13 (1st Cir. 2010) (relying on Neder v.

United States, 527 U.S. 1, 23, 119 S. Ct. 1827 (1999), and quoting United States v. Young,

955 F.2d 99, 102 (1st Cir. 1992)).  "Thus, to amount to embezzlement, conversion must be

committed by a perpetrator with fraudulent intent[.]"  Sherman 603 F.3d at 13.  "It is

knowledge that the use is devoid of authorization, *scienter* for short, *see* Palmacci v.

Umpierrez, 121 F.3d 781, 786 (1st Cir.1997), that makes the conversion fraudulent and

thus embezzlement[.]"  Sherman, 603 F.3d at 13.  "'Embezzlement accordingly requires

proof that (i) property in the perpetrator's lawful possession but (ii) belonging to another

(iii) was appropriated by the perpetrator in a manner inconsistent with the property

rights of the other and the scope of his or her authorization to deal with the property (iv)

with fraudulent intent."  Matthews v. Nealon (In re Nealon), 532 B.R. 412, 424 (Bankr. D.

Mass. 2015) (citing McQuillin, 509 B.R. at 785)).

The exception to discharge under § 523(a)(4) for embezzlement is inapplicable to

the Loans which consisted of funds advanced by Zacharakis either directly to the LLCs

or to Linear. There can be no claim at all for embezzlement with respect to the portion of

the funds paid directly to Linear because such funds never came into the Debtor's

possession.  With respect to the portion of the loaned funds which went directly to the

LLCs and therefore into the Debtor's possession, those monies were the property of the

LLCs, albeit subject to Zacharakis's right of repayment.  The Court finds that Zacharakis cannot maintain a claim against the Debtor for embezzlement of that portion of the Loans under § 523(a)(4) for the same reasons articulated above with respect to the Missing Cash and the Prestige Equipment, i.e., such claims would belong to the LLCs even though they can no longer assert them.  While Zacharakis suffered an individual loss because he was not repaid, he cannot redress that repayment through the usurpation of a claim owned by the LLCs.  For the above reasons, the Court finds that Zacharakis has not sustained his burden under § 523(a)(4) and shall enter judgment for the Debtor on Count I.

      D.    <u>Count II (§ 523(a)(2)(A))</u>

        1.    Applicable Law

Section 523(a)(2)(A) provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt-- . . .
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>>
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . .

11 U.S.C. § 523(a)(2)(A).

To establish that a debt is excepted from discharge because it was obtained by "false pretenses, a false representation, or actual fraud," a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to

rely upon the false statement, 4) the creditor actually relied upon the misrepresentation,

5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement

caused damage. McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001) (citing

Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir.1997) (footnote omitted).

At trial, Zacharakis testified that he was receiving daily sales numbers from the

Debtor at the time he was making the Loans and assumed at that time that all cash sales

revenues were being deposited into the Memoza and M&Z bank accounts.  He added

that, had the full deposits been made, he would not have had to make the Loans in the

first place.  Based upon Zacharakis's testimony, his claim for nondischargeability with

respect to the Loans under § 523(a)(2)(A) appears to be that the Debtor's failure to advise

Zacharakis that all cash was not being deposited into the LLCs' bank accounts while he

was reporting the daily gross sales figures to him constituted a misrepresentation of the

Companies' true financial condition. Representations can be either express or implied.

"A false representation is an express misrepresentation, while a false pretense refers to

an implied misrepresentation of 'conduct intended to create and foster a false

impression.'" Nat'l Bank of N. America v. Newmark (In re Newmark), 20 B.R. 842, 854

(Bankr. E.D. N.Y. 1982) (quoting H.C. Prange Co. v. Schnore (In re Schnore), 13 B.R. 249,

251 (Bankr. W.D. Wis. 1981)).   Overt misrepresentation is not required under §

523(a)(2)(A); a misrepresentation regarding a material fact may be implied from one's

silence.  Parker v. Grant (In re Grant), 237 B.R. 97, 113 (Bankr. E.D. Va. 1999).  The finder

of fact may "infer[ ] or imply[ ] bad faith and intent to defraud based on the totality of the

circumstances when convinced by a preponderance of the evidence." Palmacci, 121 F.3d

71

at 789 (quoting <u>In re Anastas</u>, 94 F.3d 1280, 1286 n.3; (9th Cir. 1996); <u>In re Sheridan</u>, 57

F.3d 627, 633 (7th Cir.1995)).

       2.     Analysis

     Zacharakis is constrained in his claims for the Loans under § 523(a)(2)(A) for a

number of reasons. First, Zacharakis has asserted no grounds, other than § 523(a)(2)(A)

itself, to impose personal liability on the Debtor for the debts of the LLCs.  He presented

no evidence that the Debtor executed a guaranty or otherwise promised to personally

repay the Loans which were advanced directly to the LLCs or Memoza's creditor, Linear.

*See* <u>Middlesex Sav. Bank v. Flaherty (In re Flaherty)</u>, 335 B.R. 481, 491 (Bankr. D. Mass.

2005) (bank failed in its burden of proof under § 523(a)(2)(A) when it asserted an

exception to discharge claim against the debtor for misrepresentations made by him in

connection with loans advanced by it to a corporation controlled by the debtor). Indeed,

the Memoza Operating Agreement expressly provided that any Voluntary Loan

advanced by one member "shall be nonrecourse to the Members . . . "  In short, the Loans

do not represent a debt of the Debtor, and § 523(a)(2)(A) cannot serve as a basis to impose

liability on him for a debt owed by the LLCs to Zacharakis.

     Second, the Court finds that Zacharakis failed to sustain his burden that he

justifiably relied on the Debtor's recitation of daily sales figures when he funded the

Loans.  To constitute justifiable reliance, a plaintiff's conduct does not have to "'conform

to the standard of the reasonable man[, as] [j]ustification is a matter of the qualities and

characteristics of the particular plaintiff, and the circumstances of the particular case,

rather than of the application of a community standard of conduct to all cases.'" <u>Field v.</u>

<u>Mans</u>, 516 U.S. 59, 70-71, 116 S. Ct. 437 (1995) (quoting Restatement (Second) of Torts §

545A cmt. b). Furthermore, "a person is justified in relying on a representation of fact

'although he might have ascertained the falsity of the representation had he made an

investigation.'" <u>Id</u>. at 70-71 (quoting Restatement (Second) of Torts § 540)). "Justifiability

is not without some limits," as "a person is 'required to use his senses, and cannot recover

if he blindly relies upon a misrepresentation the falsity of which would be patent to him

if he had utilized his opportunity to make a cursory examination or investigation.'" <u>Id</u>. at

71 (quoting Restatement (Second) of Torts § 541, cmt. a)).

Although the Debtor's silence concerning the failure to make all cash deposits

could have, in some circumstances, created or fostered a false impression, Zacharakis's

reliance cannot be said to have been justified under the facts of this case.  The LLCs were

formed and the Franchise Agreements were signed shortly after Zacharakis met the

Debtor, and the two did not have a long-standing relationship prior to undertaking the

business venture.  Additionally, Zacharakis knew that the Debtor had a full-time job at

the Sheriff's Department and had little, if any, real experience running a business, let

alone a fast food restaurant and coffee/donut shop which generated significant cash

revenue.  Zacharakis, on the other hand, was an experienced gas station manager and

seasoned business person.  While the Debtor lacked sophistication and business acumen,

it is hard to understand how Zacharakis inquired only about gross sales figures and made

no apparent, even cursory, inquiry about net income, expenses or cash management at

the time he advanced the Loans.  Given the Debtor's managerial inexperience, and indeed

incompetence, the Court finds believable his testimony that he focused only on whether

73

the business "did better [on sales] than the day before," but it cannot conclude that Zacharakis's reliance solely on the sales numbers was justified.  To the extent Zacharakis asserts that the Debtor's intent to defraud him can be gleaned by a totality of the circumstances, the Court finds that most of the Debtor's dishonest or questionable conduct (the on-line banking transfers between the business and personal accounts, the break-in at the Memoza Location, the removal of the Prestige Equipment, the cessation of cash deposits into the Memoza account, the refusal to give up the checkbooks, and the failure to cooperate with sale efforts to Sunil Patel) occurred after Zacharakis advanced his last loan in 2012.

Zacharakis cannot salvage his claim to the Loans under § 523(a)(2)(A) by reliance on the Supreme Court's recent ruling in Husky Int'l Elecs., Inc. v. Ritz, __ U.S. __, 136 S. Ct. 1581 (2016).  In Husky, a trade creditor (Husky) of a company (Chrysalis) controlled by the debtor (Ritz), asserted an exception to discharge claim against Ritz who had drained Chrysalis of assets by transferring its funds to other entities he controlled.  Husky asserted that the inter-company transfer scheme constituted "actual fraud" under § 523(a)(2)(A). The Supreme Court held that "actual fraud," which it defined "as anything that counts as 'fraud' and is done with wrongful intent[,]" includes fraudulent conveyance schemes even when they do not involve a false representation.  Id. at 1586, 1590.

Zacharakis's reliance on Husky is misplaced.  First, Zacharakis has not asserted a fraudulent conveyance theory, as was the case in Husky.  Second, Zacharakis has asserted no grounds, other than § 523(a)(2)(A), to hold the Debtor personally liable for the Loans,

74

unlike the case in <u>Husky</u> in which the plaintiff relied on a Texas statute which permits creditors to hold shareholders liable for corporate debt under certain circumstances. <u>Id</u>. at 1585.  *See* Tex. Bus. Orgs. Code Ann. § 21.223(b) (West 2012). Third, this Court construes <u>Husky</u> narrowly and concludes that its finding is limited to a determination that "actual fraud" does not require a misrepresentation.

Lastly, the Court finds that Zacharakis failed to establish by a preponderance of the evidence that the Debtor committed "actual fraud" with respect to the failure to deposit all cash revenue.   The Summary reflects that there were only a few days during the entire Reporting Period on which the cash receipts for M&Z or Memoza nearly equaled the cash deposited into their bank accounts. Based upon the testimonial evidence concerning the methods used for the daily cash collection and deposits, it is reasonable to infer that cash was taken or used on a daily basis, leaving it unavailable for deposit. The evidence is insufficient, however, to conclude that the Debtor, who was largely absent from the stores during the work week, diverted cash for personal or non-business purposes.[27]

The Court concludes that the missing cash deposits are largely, if not completely, attributable to the Debtor's careless management of the business and the significant cash flow problems experienced by the business. Despite his assertions to the contrary at trial, the Court finds that the Debtor controlled the LLCs.  Samia and Lina may have handled the bulk of the daily on-site operational duties, including waiting on customers, making

---

[27] The Court notes that the Debtor's schedules of assets and liabilities reflect total assets of $279,338 and total liabilities of $478,995.43 (many related to "trade debt").

cash deposits and dealing with vendors and employees, but the Debtor was the key decision maker and commanded managerial control and oversight of the business. He spent time at the stores on weekends, executed promissory notes and guarantees to business creditors, kept track of daily sales information, had access to the Companies' on-line bank accounts and made numerous transfers in and out of such accounts for different purposes, had possession and control of the Companies' checkbooks, paid bills, instructed Samia and Lina to notify employees not to cash their paychecks when there were insufficient funds to honor the checks, handled the meals and income tax reporting and payment plans with the MDOR, purchased supplies for the stores when necessary and loaned substantial sums to the Companies to help keep them afloat. Unfortunately, his management was haphazard: he did not check bank balances prior to writing checks, he permitted employees to be paid in cash, he could not explain multiple inter-company bank transfers occurring on the same day, he did not read tax returns or legal documents such as the Settlement Agreement prior to signing them, and he did not notice when checks bearing the name "Jamie Melo Memorial Fund" were issued to pay business expenses. Many of these actions were detrimental to the Debtor's self-interest as he remained personally liable on several business debts.

Additionally, there was credible testimony that numerous legitimate business expenses, such as those for goods, products, wages, salaries, and gasoline were paid by cash and that the Debtor reimbursed himself in cash after paying business expenses, a claim which could have been refuted by the bookkeeper had she been called as a witness by Zacharakis. While the Debtor and Samia did not fully explain the disposition of all of

the Missing Cash, the Court cannot ignore that the business continued to operate under the Debtor's management for more than a year after Zacharakis stopped funding the Loans. Thus, it is reasonable to conclude that most, if not all, of the Missing Cash was used to pay business expenses absent contrary evidence.   Moreover, the Debtor himself loaned more than $124,000 to the business.   It is unlikely that he was intentionally diverting cash in a fraudulent manner while simultaneously keeping the business afloat with his own money.  Despite Lina's different recollection, the Court is inclined to believe the Debtor's contention that the business had cash problems from the outset and that it was in constant need of cash: "Things just kept falling behind and in order to go forward we'd have to put money in."   Vendors, landlords, and the MDOR went unpaid or were paid late, the Companies bounced checks with resulting bank fees, and employees were told to wait to cash their paychecks.  The Debtor personally funded some of the shortfalls through his own loans, but did not have the skills or financial sophistication to manage this business.  Despite the negative consequences for Zacharakis, the Court finds that the Debtor was engaged in mismanagement rather than actual fraud.  For the above stated reasons, the Court finds that Zacharakis has not sustained his burden under § 523(a)(2)(A) and shall enter judgment for the Debtor on Count II.

  E.    Count III (§ 523(a)(6))

    1.  Applicable Law

Section 523(a)(6) provides:

  (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt-- . . .

77

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(6).

In <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 118 S. Ct. 974, (1998), the United States Supreme Court addressed the definition of the term "willful." The Court determined that the term "willful" modifies the word "injury" in § 523(a)(6) and, therefore "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." <u>Id</u>. at 61. (emphasis in original). Thus, recklessly or negligently inflicted injuries are not excepted from discharge under § 523(a)(6). <u>Id</u>. at 64. *See also* <u>Trenwick America Reinsurance Corp. v. Swasey (In re Swasey)</u>, 488 B.R. 22, 34 (Bankr. D. Mass. 2013).

   2.  Analysis

Zacharakis did not establish at trial that the losses connected to the Loans were due to a deliberate or intentional injury inflicted on him by the Debtor.  To the contrary, the Debtor loaned more funds to the business ($124,734.12) than Zacharakis did ($84,211.16), and the Debtor remained liable on many business debts.  There was insufficient evidence from which the Court could find that the Debtor intended to injure Zacharakis.

The Debtor was evasive and untruthful at several points during the trial, admitted to lying at his Deposition and took possession of LLC property on more than one occasion.  To be sure, there are several unanswered questions about his conduct and why he continued to manage the business when he was clearly in over his head.  The bases

asserted by Zacharakis for claims against the Debtor, however, do not give rise to the finding of an exception to discharge against the Debtor for willful and malicious injury. The Court shall enter a judgment on Count III in favor of the Debtor.

## VII.    CONCLUSION

For all of the above stated reasons, the Court finds that Zacharakis has not sustained his burden of proving an exception to discharge for any debt owed to him by the Debtor pursuant to 11 U.S.C. § 523(a)(2)(A), (4) or (6). The Court shall enter a separate judgment in favor of the Debtor with respect to all remaining counts in the Complaint, namely Counts I, II and III.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: September 20, 2016